Anita M. GRAY; Dorothy G. Keeney; Donald E. Krause; George H. Laird, III; Robert R. Merkert; Linda M. Roeder; Leroy E. Spangler

v.

YORK NEWSPAPERS, INC.; Garden State Newspapers, Inc.; Media News Group, Inc.

Anita M. Gray, Dorothy G. Keeney, George H. Laird, III, Appellants.

Nos. 91–5644, 91–5645 and 91–5646.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit Rule 12(6) Feb. 10, 1992.

Decided Feb. 19, 1992.

Rehearing Denied March 19, 1992.

Elliott A. Strokoff, Strokoff & Cowden, P.C., Harrisburg, Pa., for appellants.

Douglas R. Pierce, M. Kim Vance, Michael K. Goodwin, King & Ballow, Nashville, Tenn., for appellees.

Before GREENBERG and COWEN, Circuit Judges, and GREEN, District Judge [*].

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### I. FACTUAL AND PROCEDURAL HISTORY

*A. Background*

Anita Gray, Dorothy G. Keeney and George H. Laird, III separately appeal from the district court's orders for summary judgment entered against them on the merits of the case on February 1, 1991, and in favor of their former employer, York Newspapers, Inc. (York), in this action alleging age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.* We will consolidate the appeals for disposition. The appellants were formerly employed by *The York Dispatch,* a daily newspaper which York purchased on March 1, 1988, and which is distributed in the York, Pennsylvania, area. Defendant-appellee York is a wholly-owned subsidiary of defendant-appellee Garden State Newspapers, Inc. The third defendant-appellee is Media News Group, Inc. which provides financial management services to York. Garden State and Media News also obtained summary judgment in their favor but this judgment was predicated on the theory that

[*] Honorable Clifford Scott Green, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

they were not the appellants' employers rather than on the lack of merit to the appellants' claims.

We describe the facts as developed in the comprehensive discovery proceedings at length, first setting forth the facts significant to all three appellants and then describing their individual situations. In general the cases concern personnel changes effectuated by York after it purchased the *Dispatch*. In particular, York brought in new management to run the newspaper, following which some employees were reassigned and others left. York contends that those who left did so through ordinary attrition, were terminated for cause because they did not meet new standards, or left because they elected to take early retirement. In part the personnel changes were triggered by York's purchase of a second newspaper, the *Sunday News*, on September 1, 1988, with the resultant consolidation of certain of the two papers' operations.

In the summer of 1988, John Reynolds, the publisher of the *Dispatch*, developed an early retirement plan which the appellants label the "secret plan." The plan was not part of the company's regular retirement program, and its contents were divulged orally to the *Dispatch*'s department heads. The plan was to be available to all employees within five years of the normal retirement age of 65.

The appellants maintain that, from the end of September 1988 through the end of February 1989, a total of 21 regular full-time employees of the *Dispatch* left their employment for reasons other than regular retirement or voluntary attrition. According to the appellants, of these 21 employees, 18 were over age 40 but only one retired under a bona fide retirement plan; eight retired under the "secret" early retirement plan and nine were either terminated or permanently laid off.[1] However, the record shows that 128 employees actually separated their employment with York during this time period. The appellants arrived at the figure of 21 by subtracting part-time employees, employees who had been with the newspaper less than three months and employees who resigned or quit.

The facts pertaining directly to each of the individual claims are as follows:

### 1. Anita Gray

In September 1988, Gray, who had been a reporter for the *Dispatch* for 27 years, the last 12 of which she spent covering the York County Courthouse, was 62 years old. Tim Graham, who began his employment at the *Dispatch* in August 1988, was the paper's Metro Editor. According to Gray, a few days after Graham arrived at the paper he asked Gray if she liked her assignment and she replied that she "really liked covering the courthouse." About one week after this conversation, Graham and Gray were discussing a conversation Gray had had with Phil Klinedinst, the *Dispatch*'s managing editor, regarding the difficulty Gray and others experienced working with a certain supervisor. While Graham suggested that Gray had the option of retiring, she told him that she had no intention of doing that.

On September 13, 1988, Graham again raised the issue of retirement by advising Gray that York was working on an early retirement package. In her affidavit, Gray maintains that Harris Sacks, a reporter for the *Dispatch* who was terminated in September 1988 at the age of 60 in what York regarded as an early retirement, told Gray that the new management was putting pressure on him to resign. Because Graham raised the issue of retirement shortly after Gray told Graham that she had no intention of retiring, and because of Gray's conversation with Sacks, Gray sought and obtained legal advice.

Gray maintains that, on September 15, 1988, the last day before her scheduled one-month vacation, she saw through a glass partition in the office that Graham was having a meeting with Sacks, who appeared to be quite distressed. Right after Sacks left the office, Graham summoned Gray into his office and offered her an

---

1. We are not concerned with the three employees under age 40.

early retirement package comprised of a $25,000 lump sum payment plus $1,000 for medical benefits, or $30,000 plus $1,000 over a two-year period. He also indicated that the offer would not "last forever."[2] Graham advised Gray that when she returned from her vacation in October, she would no longer have the "courthouse beat," but would work on "general assignment reporting," an assignment Gray regarded as "demeaning." However, her title and salary were to remain the same.

At that same meeting Gray asked Graham why he was reassigning her and he replied that he had someone "much stronger" for the courthouse, Mike Snyder, a 30–year old entertainment reporter at the *Dispatch* with no court-reporting experience. That day, Gray wrote to Reynolds, the publisher of the *Dispatch*, stating that she "will discuss any [early retirement] proposals with [her attorney] when I return and would expect to be given a reasonable length of time to make a decision."

When Gray returned from her vacation she learned that Snyder had refused the courthouse assignment. Graham called Gray into his office on her first day back and asked Gray if she had made up her mind about retirement; she told Graham that she had not. Graham then told Gray that he had realized that there was more to covering the courts than he had originally thought, and that Gray could continue to cover the courts for the paper. When Gray asked Graham if Snyder had turned the job down, Graham indicated that Snyder wanted to remain an entertainment reporter. In her affidavit, Gray states: "Therefore, I concluded that Graham was lying to me and that I would be covering the courts only temporarily until another replacement could be found. I concluded this probably wouldn't be too long because if Graham first wanted Snyder, obviously experience in court coverage wasn't a consideration."

Gray had contemplated the early retirement offer during her vacation and, after she had returned, discussed it with her husband, daughters, several friends and attorney. On or about October 25, 1988, Gray informed Graham that she had decided to accept York's offer of early retirement. Gray nevertheless maintains that her retirement was, in effect, involuntary. She states in her affidavit that, when she returned from her vacation, she learned that Sacks had been "forced out" of his job and that a co-worker, Linda Roeder, "had been harassed to the point where she had to go on medical leave." Moreover, Gray perceived that the new management did not treat the older employees well and, because she did not know of any other employees who were offered early retirement, she felt isolated. She explains:

> I would have to endure what Harris Sacks went through, and what Linda Roeder was going through. At that time, I did not feel I had the emotional and financial strength to oppose management's efforts to get me out. I felt that if I refused the early retirement offer, I would soon find myself harassed and then forced out of a job without anything. Therefore, although I had not even reached the point where I was thinking about planning for retirement and I wanted to work for several more years as a reporter for *The York Dispatch*, under all the circumstances, I felt I had no real practical choice but to accept their early retirement offer.

App. at 103.

On October 27, 1988, Gray sent a memorandum confirming her acceptance of the early retirement offer. The next day Peter Bhatia, the editor of the *Dispatch*, sent Gray a confirming memorandum. On October 29, Gray gave "formal notice" of her retirement. Gray asked that there not be a lot of fanfare surrounding her retirement and after she was presented with the traditional *Dispatch* retirement gift, Gray sent Bhatia and Graham a cordial, hand-written note thanking them for respecting her wishes.

---

**2.** It appears that these early retirement benefits were in addition to the normal benefits due Gray.

### 2. Dorothy G. Keeney

Dorothy G. Keeney was employed full-time as the switchboard operator for the *Dispatch* from January 4, 1961, to September 30, 1988, and, at 77, was the oldest employee at the newspaper. Keeney operated the switchboard from 8:00 a.m. to 5:00 p.m. Mondays through Thursdays and from 8:00 a.m. to 1:30 p.m. on Fridays. Other employees at York filled in for Keeney one hour per day during Keeney's lunch and on Friday afternoons.

Keeney's immediate supervisor, Robert Merkert, testified that he was called into the office of Ed Magee, the *Dispatch's* finance director, and that Magee, who also was head of Keeney's department, said to Merkert, "John—referring to Mr. Reynolds—caught Dottie [Keeney] napping at the switchboard. Something has to be done. She's too old. She should have retired. Got to get her out." A few weeks after this conversation, Magee announced that the hours of the switchboard would be extended one hour to 6:00 p.m. and that the switchboard would thereafter be manned by two part-time operators, one working from 8:00 a.m. to 1:00 p.m. and the other working from 1:00 p.m. to 6:00 p.m., five days per week. When Magee offered one of the part-time jobs to Keeney, she asked if health insurance coverage, which she had as a full-time employee, would be provided to her if she accepted the offer. While Magee responded that he would check into the matter and get back to her with an answer, he never did so.

Keeney alleges that she would have accepted a part-time position if health insurance coverage were provided, but that she "assumed that Magee's failure to advise her that health insurance was provided meant that it was not." Keeney further alleges that she learned that she would be covered by health insurance if she retired, and for this reason decided to retire rather than accept the part-time position. Although several weeks transpired between the time Magee offered Keeney the part-time position and the time Keeney retired, Keeney made no further inquiries regarding whether insurance would be provided if she continued working. The two part-time switchboard operators, Freda Driscoll, who was then 58 years of age, and Rita Plath, then age 39, did not receive health insurance benefits.[3]

### 3. George H. Laird, III

George H. Laird, III was employed at the *Dispatch* from September 16, 1963, to January 17, 1989, when at the age of 50 he ceased working for York. During his last 11 years at the *Dispatch*, Laird was a copy editor, writing headlines and editing stories for spelling, grammar, punctuation, content and factual discrepancies. He also edited errors from the newspaper's early edition to prevent their appearance in the final edition. Additionally, Laird laid out certain sections of the paper, and selected stories for print from the wire services. A former editor of the paper described Laird as "quite competent ... dependable and precise...." A co-worker stated that Laird had demonstrated knowledge and skill in the use of the Atex computer system. Sacks stated that Laird was "a brilliant man and an excellent and hard-working copy editor. He was such a perfectionist in his copy editing that he was sometimes referred to as a nit picker." Katherine Searle, a librarian in the editorial department, stated that she knew Laird "to be a very thorough and proficient copy editor," and that "[h]e was regarded by me and almost everybody in the newsroom as a perfectionist," and was very hard working. Laird alleges that, until the last week of November 1988, there is no record of any blemish on his service to the *Dispatch*.

According to York, however, the new management at the *Dispatch* viewed things differently. Shortly after York bought the *Dispatch*, it implemented a number of changes to improve the newspaper's quality and appearance. Nelson Lampe, the deputy managing editor of the *Dispatch*,

---

**3.** Keeney states in her brief that Driscoll subsequently quit and was replaced by Jennifer Thoman, who was born on February 8, 1963, but we have not been able to verify this from the record.

distributed a five-page memorandum to the editorial staff outlining the paper's "new look", and announced that the paper was adopting new styles for headlines, bylines, photo captions and jump lines. Additionally, York adopted the Associated Press Stylebook (AP Stylebook) to achieve clarity and consistency in writing style.

Lampe reviewed the paper on a daily basis, making editorial comments with a grease pencil and providing daily feedback by leaving the marked-up pages, or "tear sheets," in the news room for the staff to see. There is no dispute that Lampe had made numerous corrections to Laird's work. Laird would review the tear sheets with Donna Miskin, the day news editor and Laird's immediate supervisor. Additionally, on two or three occasions Lampe met with Laird to discuss Laird's performance. Lampe expressed dissatisfaction with Laird's attitude and ability to adapt to the format changes.

Laird was responsible for several errors that appeared in the *Dispatch* in late 1988 and early 1989. For example, in the November 30, 1988 edition of the paper, Laird incorrectly edited an obituary. The first edition of the paper stated that funeral services were scheduled for 2:00 p.m., but failed to indicate the date. Laird added the word "Friday," but this turned out to be erroneous as the service was to be held on Saturday. Laird's correction indicated that the funeral would take place before the viewing.

The next day, Laird failed to notice a misspelling of the word "gauge" in a front-page headline that read "Indicators Guage Up." [4] Two days later, Laird overlooked a misspelling of the word "noble" in the headline stating "Dog with a nobel lineage sparks events."

On December 1, 1988, Lampe orally warned Laird that York could not tolerate such mistakes and that Laird should not let such mistakes happen again. Laird was given a formal letter of reprimand on December 8, 1988, which stated that "[a]ny further such errors on your part could lead to further disciplinary action, up to and including dismissal." Following this reprimand, Lampe continued to observe deficiencies in Laird's work, including improper punctuation, improper capitalization, improper layout, misspelled headlines, failure to follow the AP Stylebook, poor allocation of space, poor news judgment, and misspelled names.

Lampe expressed concern about Laird's attitude, and again met with Laird on January 5, 1989. Lampe discussed Laird's recent editing errors and his accrual of what Lampe considered to be unnecessary overtime. On January 11, 1989, Laird was asked to complete a self-evaluation, which involved rating himself in nine categories relating to work performance, capacity and attitude toward job. There were five possible ratings: outstanding, above average, satisfactory, below average and unsatisfactory. There was also a question and answer portion. Laird rated himself "satisfactory" in all categories and gave terse answers in the question and answer portion. For example, in response to the question "Briefly appraise this employee's potential and future," Laird responded "limited only by my circumstances," and in response to the space for "performance objectives," he stated "personal satisfaction."

On January 16, 1989, Lampe evaluated Laird and rated him "unsatisfactory" or "below average" in all but the category for attendance, in which he rated Laird "satisfactory." In particular, Lampe gave Laird a "below average" rating in the areas of "quantity of work" and "judgment" and an "unsatisfactory" rating in the areas of "quality of work," "dependability," "initiative," "interest" and "cooperativeness." Lampe listed "[a]ttendance" as Laird's only strong point, and listed as Laird's weak points: "Lack of self-direction. Inability to lay out pages following our typographic style. Failure to perform duties in a professional manner. Failure to adhere to widely known and distributed stylistic guidelines." Lampe also stated that, "[l]ike other desk members, George has had 4½ months to bring his performance

---

**4.** Laird admits that headline errors are considered "major" errors.

and skills up to acceptable levels. He has not."

After evaluating Laird, Lampe determined that he should be terminated, and discussed this decision with Miskin and Bhatia, who both concurred. Laird was given a formal notice of termination on January 16, 1989, but was given an "early retirement offer" "[b]ecause of [his] 25–plus years with the Dispatch ..." which was contingent on Laird's submitting a letter of resignation the following day, which he did. York initially did not hire a replacement for Laird but instead assigned Edward "Turk" Pierce, who was then 49 years old, and who held a similar position on the night shift, to replace him. Approximately three and one-half months later, York requested resignations from three other copy editors who were ages 33, 38 and 31.

Laird does not dispute that he made the errors to which we refer. Rather, he produced an affidavit from a former reporter at the *Dispatch* who stated that "[a] copy editor's failing to catch errors in copy is an almost everyday occurrence. Errors in headlines and introducing an error into copy, while not everyday occurrence[s], were still quite frequent." Additionally, the reporter stated that all copy editors regularly made such errors but, with the exception of Laird, none were disciplined or reprimanded. The deputy news editor who, as a union official, is familiar with disciplinary matters, similarly stated that, "[f]rom September of 1989 to January 15, 1990, such errors were called to a copy editor's attention in a friendly, informational and usually off-handed manner. No copy editor was disciplined during that time frame for copy editing errors, of which there were many."

### B. Procedural History

After the appellants and four other employees filed charges of age discrimination with the Pennsylvania Human Relations Commission that were cross-filed with the Equal Employment Opportunity Commission, the appellants and the other employees filed this action in the United States District Court for the Middle District of Pennsylvania. At the close of discovery, the appellees jointly moved for summary judgment as to six of the seven plaintiffs on the merits of the case. Additionally, Garden State and Media News moved for summary judgment contending that they were not the appellants' employers. After these motions were filed, two plaintiffs who are not appellants dismissed their claims.

On February 1, 1991, the district court granted York's motion on the merits on the claims of Gray, Keeney and Laird. The court concluded that Gray retired voluntarily and that the retirement plan did not violate the ADEA. It ruled that Keeney failed to establish any genuine issue of material fact as to whether York's proffered reason for her termination was pretextual. The court held that, while Laird established a *prima facie* case of discrimination, he failed to establish that he possessed the qualifications for his position at the time of his discharge, or that similarly situated younger employees were treated more favorably. Additionally, the court held that Laird failed to demonstrate that age was a factor in his termination. Finally, the court granted the motions of Garden State and Media News on the ground that, while there was a financial link between them and York, there was no showing that they had any connection with the employment decisions in these cases and that the appellants did not demonstrate that they had any control of labor relations, or that there was an interrelation of operations or common management.

Originally, Gray, Keeney and Laird filed a joint notice of appeal, but as the claims of two other plaintiffs were still outstanding in the district court, we dismissed the appeal. After those claims were dismissed in the district court, Gray, Keeney and Laird filed separate notices of appeal. The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4), and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

■ The scope of review of an order granting summary judgment is plenary. *Philadelphia & Reading Corp. v. United States*, 944 F.2d 1063, 1070 (3d Cir.1991); *Wallach v. Brezenoff*, 930 F.2d 1070, 1071 (3d Cir.1991). "We apply the test provided in Federal Rule of Civil Procedure 56(c): (1) is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?" *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1060 (3d Cir.1991) (quoting *Int'l Union, UMWA v. Racho Trucking Co.*, 897 F.2d 1248, 1252 (3d Cir. 1990)). A disputed fact is "material" if it would affect the outcome of the suit as determined by the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, while the facts must be viewed in the light most favorable to the nonmoving party and all inferences must be drawn in that party's favor, *see Erie Telecommunications, Inc. v. Erie*, 853 F.2d 1084, 1093 (3d Cir.1988), "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not significantly probative, .... summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

## III. ANALYSIS

### A. *General Principles*

■ The framework of the evidentiary burdens in actions under the ADEA is now well settled. The plaintiff must first establish a *prima facie* case of discrimination. In the absence of direct evidence, a plaintiff may establish a *prima facie* case by demonstrating by a preponderance of the evidence that he or she (1) belongs to a protected class, *i.e.* is at least 40 years of age; (2) was qualified for the position; (3) was dismissed despite being qualified; and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination. *Billet v. Cigna Corp*, 940 F.2d 812, 816 n. 3 (3d Cir.1991); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004

(1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir.1987) (in banc), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). A *prima facie* case creates an inference of unlawful discrimination. The burden of production then shifts to the defendant-employer who can dispel the inference by articulating a legitimate business reason for discharging the employee. *Billet*, 940 F.2d at 816; *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 342 (3d Cir.1990); *Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 53 (3d Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990).

■ If the defendant meets this burden, the plaintiff then must prove by a preponderance of the evidence that the articulated reasons are a pretext for discrimination. *Billet*, 940 F.2d at 816; *Turner*, 901 F.2d at 342; *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 764 (3d Cir.1989), *cert. denied*, 493 U.S. 1062, 110 S.Ct. 880, 107 L.Ed.2d 962 (1990). Pretext may be proved either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Billet*, 940 F.2d at 816; *see also, Turner*, 901 F.2d at 342; *Sorba v. Pennsylvania Drilling Co.*, 821 F.2d 200, 203 (3d Cir.1987), *cert. denied*, 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988); *Chipollini*, 814 F.2d at 898. At all times, the plaintiff-employee has the burden of persuading the trier of fact that age was a determinative, though not necessarily the sole, factor in the defendant-employer's decision to take an adverse employment action against the employee. *Turner*, 901 F.2d at 342. While "the prima facie case is rarely the focus of the ultimate disagreement[,]" *Healy*, 860 F.2d at 1214 n. 1, at issue in each of these appeals is whether the appellants have satisfied their initial burden in establishing a *prima facie* case, as will be discussed below.

### B. *Application of the Principles*

#### 1. Gray

##### a.

■ Gray cannot establish a *prima facie* case of age discrimination because she was

not discharged from her employment with York but rather voluntarily elected early retirement. Gray maintains that, resolving all factual inferences in her favor, there was ample evidence from which a jury could conclude that a reasonable person in her position would resign under the circumstances. We employ an objective test in determining whether an employee was constructively discharged from employment: whether "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 887–88 (3d Cir.1984); *see also Schafer v. Bd. of Pub. Educ.*, 903 F.2d 243, 248–50 (3d Cir. 1990); *Levendos v. Stern Entertainment, Inc.*, 860 F.2d 1227, 1230 (3d Cir.1988); *Spangle v. Valley Forge Sewer Auth.*, 839 F.2d 171, 173 (3d Cir.1988).[5]

Gray contends that her decision to retire was her only practical choice since she: (1) had witnessed Harris Sacks forced out of his job by the new management; (2) knew that Linda Roeder had been harassed by the new management to the point where she had to take medical leave; (3) felt isolated by being offered a "secret retirement" option; (4) had been told she was going to be removed from her long-time courthouse beat after she had told her new boss how much she enjoyed that work; and (5) felt that Graham lied to her regarding the reasons he permitted her to continue in the courthouse beat after being told she would be reassigned.

We first adopted the doctrine of constructive discharge in a Title VII case in *Goss.* In that case, Goss, a married woman who was a successful sales representative for Exxon and had a lucrative territory that included several large accounts, was interrogated by her supervisor about her plans to have a family. Shortly after Goss became pregnant, the supervisor expressed doubts regarding Goss' ability to combine motherhood and a career. Goss suffered a miscarriage, but returned to work with no loss of time. A few months later Goss again became pregnant. In a meeting with her supervisor, he became verbally abusive and indicated that he was thinking about removing her from a large account, and again questioned Goss about the dual responsibilities of career and motherhood to such an extent that she began crying. Goss suffered a second miscarriage that same month, but again returned to work shortly thereafter. When she returned to work, Goss was told that she no longer would have her usual territory and was being replaced. After objecting to the transfer, Goss was told either to sign a writing accepting her new territory or resign. The supervisor was quoted as describing Goss as a " 'wackko,' pregnant, and likely to leave." 747 F.2d at 888. Under these facts, after a trial, the district court found that Goss was constructively discharged, and we affirmed, concluding that the district court's findings were legally sufficient and based on credibility judgments. *Id.* at 888–89.

In *Levendos* we vacated a summary judgment which had been granted in favor of the employer on the ground that no material issue of fact was raised regarding whether the employee was constructively discharged from her employment as a maitre'd. The plaintiff-employee filed an affidavit stating, *inter alia*, that she was the only woman in a management position; that she was excluded from management meetings; that the general manager of the restaurant boasted that the plaintiff "would not be there long;" that management told other employees that the plaintiff did not fit the mold of a maitre'd because she was a woman; that the owner asked an employee to find a man to replace the plaintiff; that management falsely accused her of stealing, drinking and fraternizing with employees; and that on one evening she discovered wine bottles placed in her locker

---

**5.** *Goss, Levendos* and *Schafer* are Title VII cases, but the doctrine of constructive discharge is the same in all employee discrimination claims such as those under the ADEA. *See, e.g., Spangle. See also, Berger v. Edgewater Steel Co.*, 911 F.2d 911 (3d Cir.1990) (applying doctrine of constructive discharge in an ERISA action), *cert. denied,* —— U.S. ——, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991).

to make it appear as if she were stealing. 860 F.2d at 1228. Additionally, a co-worker submitted an affidavit praising the plaintiff's work and reputation and stating that management disliked women. In a complaint filed with the EEOC, the plaintiff alleged that she was not permitted to order supplies although a male manager was able to do so, and that she was replaced by a male friend of the chef. *Id.* The plaintiff resigned, stating that her decision was precipitated by the accusations of stealing.

In vacating, we noted that, while the plaintiff had the ultimate burden of persuasion, the employer had the burden to demonstrate the absence of material facts on its motion for summary judgment, regardless of the plaintiff's burden. *Id.* at 1229 & n. 4. We held that the record "contain[ed] more than a scrap of evidentiary material, ... from which a fact-finder could infer that conditions at the restaurant were so intolerable that a maitre'd of reasonable sensitivity would be forced to resign," and that the plaintiff's affidavit alone was sufficient to defeat summary judgment. *Id.* at 1231 & n. 7 (quoting *Jackson v. University of Pittsburgh*, 826 F.2d 230, 234 (3d Cir.1987)) (internal quotation marks omitted), *cert. denied*, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988)).

In *Schafer*, a male school teacher brought a Title VII action against his school board on the ground that he was denied a one-year paternity leave after the birth of his son, while similarly situated female teachers were entitled to that leave under the parties' collective bargaining agreement. The employee, Schafer, told the board that he would be forced to resign if he could not obtain appropriate child care and if he were denied leave. Although Schafer was granted a three-month unpaid emergency leave, he was denied his requested one-year leave and, accordingly, he resigned. The district court granted the school board's motion for summary judgment, but noted that a factual issue was presented regarding the reasonableness of the plaintiff's decision to retire. We reversed, finding that the board violated the employee's rights under Title VII as a matter of law. On the issue of constructive

discharge, we concluded that the district court properly determined that a material issue of fact existed and remanded for a determination as to whether Schafer was constructively discharged.

In *Berger v. Edgewater Steel Co.*, 911 F.2d 911 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991), the new owner of the defendant-employer, which was experiencing "serious financial difficulty," eliminated certain pension benefits and initiated a reduction in workforce. Five former employees brought an action claiming, *inter alia,* that the elimination of benefits amounted to a constructive discharge that established a *prima facie* case under section 510 of ERISA. Citing *Henn v. National Geographic Soc'y*, 819 F.2d 824 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987), we held that the employer's conduct did not rise to the level of a constructive discharge since "there [wa]s nothing to indicate that the Employees would have been fired had they not chosen to retire and accept the special payment." 911 F.2d at 923.

*Henn* involved claims similar to those asserted by Gray. In that case, the National Geographic Society, experiencing a decline in advertising, decided to reduce the number of its salespersons by making a "one-time" offer of early retirement to salespersons over age 55. The offer included a severance payment of one-year's salary, retirement benefits "calculated as if the retiree had quit at 65" and additional medical and life insurance benefits. While most of the eligible employees accepted the offer, some of those employees filed an action against the employer claiming that the offer violated the ADEA. In rejecting the claim, the court of appeals recognized that an offer of early retirement can only *benefit* employees to whom the offer is made:

> [W]e start by assuming that the employer is complying with the ADEA.... Now the employer adds an offer of early retirement. Provided the employee may decline the offer and keep working under lawful conditions, the offer makes him

better off. He has an additional option, one that may be (as it was here) worth a good deal of money. He may retire, receive the value of the package, and either take a new job (increasing his income) or enjoy new leisure. He also may elect to keep working and forfeit the package. This may put him to a hard choice; he may think the offer too good to refuse; but it is not Don Corleone's 'Make him an offer he can't refuse.' 'Your money or your life?' calls for a choice, but each option makes the recipient of the offer worse off. When one option makes the recipient better off, and the other is the status quo, then the offer is beneficial. That the benefits may overwhelm the recipient and dictate the choice cannot be dispositive. The question 'Would you prefer $100,000 to $50,000?' will elicit the same answer from everyone, but it does not on that account produce an 'involuntary' response.

819 F.2d at 826.

Later in the opinion, the court noted that:

[t]he 'voluntariness' question ... turns on such things as: did the person receive information about what would happen in response to the choice? was the choice free from fraud or other misconduct? did the person have an opportunity to say no? A very short period ... would show that the offer of information was illusory and there was no informed choice. But when the employee has time to consult spouse and financial adviser, the fact he still found the decision hard cannot be decisive.

*Id.* at 828–29.

■ Like the plaintiffs in *Henn*, Gray primarily relies on the fact that she was offered early retirement in support of her constructive discharge claim. At her deposition, Gray was pressed to explain why she felt she had no choice but to retire:

Q: Why did you feel you were being pressured to leave on September 15th?
A: Because out of the clear blue sky early retirement was being put to me and

it seemed to me there was a little message there.

. . . .

I felt that if I decided not to retire that in a matter of time they would be rigging up some errors that I had made, any number of things to get me out. I figured they wanted me out, they were going to do it one way or another.
Q: What made you feel that way?
A: The personalities of the people involved, their attitudes, what they had said to—what Tim [Graham] had said to me.
Q: On which occasion?
A: On most any occasion.
Q: What did Tim say to you that made you feel that way?
A: You have the option to retire. If you—
Q: When you say he said that you have the option to retire, I'm not sure what you mean by option.
A: I'm not sure either, other than that's what he said to me.
Q: What did you understand him to mean when he said option to retire?
A: As I explained earlier, I thought he was referring to a statement I had made one time to Phil [Klinedinst] and that possibly Phil had repeated this to him and Tim was acting on that prior conversation when he said, oh, I guess Phil did mention it. I thought it was—coming out of the blue as it did—it was rather portentous.
Q: What makes you say that?
A: Just that that's what I thought.

App. at 74–76.

Of course, "the mere offer of an early retirement program does not support an inference of discrimination...." *Colgan v. Fisher Scientific Co.*, 935 F.2d 1407, 1422 (3d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991).

However, Gray alleges more than did the employees in *Henn* in that Gray relies on more than just the offer of early retirement to support her claim of constructive discharge.[6] Specifically, as indicated

6. The employees in *Henn* also contended that

they received the "silent treatment" while mull-

above, Gray relies on her perception of the way management treated other employees, management's threat of removing her from her long-time courthouse beat, and her determination that she had been lied to regarding the reasons she would not, in fact, be reassigned. According to Gray, these beliefs formed the basis of her assessment that, "if I refused the early retirement offer, I would soon find myself harassed and then forced out of a job without anything." But the issue is whether "[t]he reasonable inferences from this record would ... allow a jury to infer that [Gray] would have been fired (in violation of the ADEA) had [she] turned down the offer of early retirement...." *Henn*, 819 F.2d at 830.

■ While all inferences are to be drawn in Gray's favor, we find that no reasonable trier of fact could conclude that Gray had "been harassed and then forced out of a job...." In our view, no inference could reasonably be drawn that Gray would have been unlawfully terminated, or that York "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss*, 747 F.2d at 888. *See Henn*, 819 F.2d at 830 ("In passing on a motion for summary judgment, a court must indulge inferences in favor of the non-moving party, but it need not indulge all possible inferences."). First, the circumstances of Sacks' and Roeder's terminations and alleged harassment, assuming those circumstances to be true, do not raise a material issue of fact regarding Gray's claim. In *Levendos* the plaintiff made specific allegations that management intended to terminate her, in addition to her allegations of egregious conduct directed toward her. In *Schafer* it certainly was not unreasonable to infer that the school board had

intended to terminate the plaintiff since the plaintiff had stated that he would be forced to resign if the board would not grant him leave and, subsequently, that is exactly what the board did. Similarly, in *Goss*, although that case did not involve a summary disposition, the plaintiff did allege specific discriminatory conduct directed towards her and not some third party. By contrast, Gray's claims do not amount to harassment directed at her.

Moreover, an inference that her working conditions would have been made intolerable on the basis of her perception of Sacks' and Roeder's terminations and alleged harassment coupled with the reassignment incident is particularly unreasonable in light of the undisputed circumstances surrounding Gray's employment at the time she retired. Initially it should be reiterated that, even if Gray had been reassigned from the "courthouse beat" to a "demeaning" general reporting assignment, the proposed reassignment would have involved no loss of pay or change in title.[7] Gray was told that she could continue in her position; her employment status was virtually unchanged. Though Gray asserts that she probably would have been terminated or reassigned if she continued, she offers no objective evidence to support this speculative and conclusory allegation. As in *Berger*, "[t]here is nothing to indicate that [Gray] would have been fired had [she] not chosen to retire and accept the special [early retirement] payment." *Berger*, 911 F.2d at 923. Moreover, York was undergoing a restructuring in which many of its reporters were to be reassigned. The ADEA must not be permitted to become a mechanism to inhibit ordinary managerial decisions.

■ The evidence demonstrates that Gray deliberated her options carefully, and

---

ing over their offers as well as threats (real and implied) of unpleasant consequences if they did not start selling more ads. 819 F.2d at 829. The court held that the record evidence of these incidents did not support a reversal of summary judgment since the plaintiffs were all producing less than their quota and were at no greater risk of discipline or discharge then they would have been had they not retired since salespersons "must endure adverse reactions and other signs

of displeasure when their productivity falls off." *Id.* at 830.

7. We do not imply that, to establish a successful ADEA claim of constructive discharge, a reassigned plaintiff must show in every case that her new job is lower-paying but simply note that this is one of the factors which undermines Gray's claim of discrimination.

elected an early retirement package which York had no obligation to offer in the first place. We recognize that Gray probably did perceive that the new management was less affable than that to which she had been accustomed, and we may assume that she *subjectively* believed that continued employment would have been uncomfortable and that she would have been demoted or terminated at some point in the future. However, as aptly stated by the Court of Appeals for the Fourth Circuit:

> the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure h[er] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by h[er] co-workers. [Sh]e is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

*Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986).

The fact is that it is inevitable that when management changes so will some of the circumstances surrounding employment. But the ADEA is a discrimination statute and is not intended to handcuff the managers and owners of businesses to the *status quo.* In short, York has demonstrated the absence of a material issue of fact regarding an essential element of Gray's *prima facie* case and conversely Gray has not "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

#### b.

Gray contends that she has alleged facts which support a claim independent of con-

structive discharge. Section 4(a) of the ADEA provides that it shall be unlawful for an employer:

> (1) to fail or refuse to hire or to discharge any individual *or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,* because of such individual's age;
>
> (2) to limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities *or otherwise adversely affect his status as an employee,* because of such individual's age;
> ...

29 U.S.C. § 623(a) (emphasis added). Gray cites *Stamey v. Southern Bell Tel. & Tel. Co.,* 859 F.2d 855, 860 (11th Cir.1988), *cert. denied,* 490 U.S. 1116, 109 S.Ct. 3178, 104 L.Ed.2d 1040 (1989), in support of her proposition that she can establish a claim of discrimination even if she cannot prove constructive discharge. In *Stamey* the court stated that the plaintiff "can prevail even if the evidence does not support an inference that she was terminated or constructively discharged. The Act [ADEA] forbids far more than merely discriminatory discharge and hiring practices." *Id.* (citing section 4(a) of ADEA). The plaintiff in *Stamey* was a 38–year employee of Southern Bell who had worked in a position that required in-depth knowledge of Bell's services and the ability to adapt these services to customers' needs. She performed so well in this position that the company assigned her to its best customers. But after the company underwent a restructuring, Stamey was given a new position which was non-managerial and involved no customer contact.

In 1981, when Stamey was 56 years old and had 37 years of experience, Bell eliminated her position and offered her a transfer to other positions such as entry-level receptionist, entry-level clerk and typist, which she considered "humiliating" and "insulting." When Stamey filed a charge of discrimination, Bell offered her her old job back, but six months later informed her that she had either to accept early retire-

ment or a transfer to a lesser paying position. Before she had accepted early retirement, Stamey's supervisors entered her office and requested her keys; an employee called Stamey at home and asked her to complete her retirement papers, and, upon her return from vacation, she found her work reassigned to another managerial employee. That month, Stamey signed her retirement papers, noting as her reason for retirement "No job offer, replaced by a management person from South Carolina." 859 F.2d at 858. After trial, a jury returned a verdict in Stamey's favor. The court of appeals affirmed, holding that a reasonable jury could have concluded that Stamey's treatment came within section 4(a) of ADEA. 859 F.2d at 860.

The facts in this case starkly contrast with those in *Stamey*. In that case, the employee was clearly demoted in an employment decision which the jury found was based on her age. In this case, Gray cannot contend that she was denied "compensation, terms, conditions, or privileges of employment ... or [that she was] otherwise adversely affect[ed] [in] h[er] status as an employee." Rather, the facts surrounding her retirement are used to support her claim of involuntariness and do not state an ADEA violation. Gray cites hypothetical examples of situations involving deception and fraud in which an employee would not be able to make out a claim of constructive discharge, *see* brief at 16, but they are just that: hypothetical examples; they are not this case. In essence, Gray seeks to eviscerate the doctrine of constructive discharge by resorting to the language of the ADEA but this begs the question.

c.

■ Finally, Gray maintains that York's "secret" early retirement program was a

subterfuge designed to compel involuntary, early retirement. This claim is based on section 4(f)(2) of ADEA, which as applicable to this case provides:

> It shall not be unlawful for an employer ...—
>
> ....
>
> (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall ... require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual[.]

29 U.S.C. § 623(f)(2).[8]

Although it has been suggested that an employer may violate the ADEA by implementing an early retirement plan that does not extend to all potentially eligible employees where the employer cannot explain why certain individuals were excluded, *see Bodnar v. Synpol, Inc.*, 843 F.2d 190, 193 (5th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988), Gray has no standing to challenge the plan here since she is a *beneficiary* of the plan and the plan did not operate to exclude Gray from any benefits. *See Henn*, 819 F.2d at 827 ("Section 4(f)(2) ... is a defense. The employer need not mount a defense unless the employee makes out a prima facie case.... An employee to whom the offer has been extended ... is the beneficiary of any distinction on the basis of age ... [and therefore cannot] claim to be adversely affected by discrimination in the design or offer of the early retirement package."); *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1427 (7th Cir.1986) (while a benefit may not be doled out in a discriminatory fashion, the defendant-employer did not deny bene-

---

8. This section was amended in 1990 to override the Supreme Court's decision in *Public Employees Retirement System v. Betts*, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), which held that an employee seeking to challenge a benefit plan under section 4(f)(2) had the burden of proving that the plan actually was intended to discriminate in violation of the ADEA. However, Gray's complaint was filed in September,

1989, and the amendments codified in the Older Workers Benefit Protection Act were given prospective effect. Pub.L. No. 101–433 § 105, 104 Stat. 978, 981 (October 16, 1990) (as amended by Pub.L. No. 101–521, 104 Stat. 2287 (November 5, 1990)). Of course, we are not suggesting that our result would be different under the amendment.

fits to employees based on age; to the contrary it showed a preference for older workers). *See also EEOC v. Westinghouse Elec. Corp.*, 925 F.2d 619, 627–28 (3d Cir.1991) (ADEA would prohibit use of benefit plan that operated to reduce non-fringe benefits of older workers); *Bodnar*, 843 F.2d at 193–94.

Gray contends, however, that even if the retirement plan is not a per se violation of ADEA, the secrecy surrounding it and the company's deliberate case-by-case implementation suggest that it intended the plan to induce involuntary retirement, and that under *EEOC v. Metal Service Co.*, 892 F.2d 341 (3d Cir.1990), "courts must be sensitive to the myriad of ways ... an inference [of discrimination] can be created," and need not analyze all factual scenarios through the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Metal Service Co.*, 892 F.2d at 348.

 While we can conceive of a situation in which a beneficiary of an early retirement plan was "induced" into retirement in violation of ADEA, Gray's claim that she was bullied into retirement by the offer is belied by the fact that she contemplated the offer for some 45 days, and discussed it with her husband, daughters, friends and attorney. There is no suggestion, other than Gray's own conclusory statements, that the company ever threatened Gray with adverse employment action if she chose not to accept the offer. When analyzed in terms of the factors suggested in *Henn*, including whether the person received information about what would happen in response to the choice; whether the choice was free from fraud or other misconduct; the length of time for consideration given the employee; and whether the employee had time to consult others about the offer; 819 F.2d at 828–29, York's implementation of its retirement plan does not raise a material issue of fact which would support an inference of age discrimination against Gray.

### 2. Keeney

The district court stated that it was undisputed that Keeney made out a *prima facie* case, but granted summary judgment in favor of York on the ground that she was unable to prove pretext. York disputes the district court finding that Keeney established a *prima facie* case, and argues that Keeney cannot establish that she was discharged in light of her election of early retirement.

As set forth above, Keeney made her decision to retire because she did not want to lose her health insurance benefits and, when faced with the choice of retirement or working part-time, she chose to retire after being told that she would continue to receive health insurance benefits upon retirement. Keeney assumed that Magee's failure to get back to her regarding the availability of health insurance meant that such insurance would not be provided with the part-time position. Keeney alleges that she would have accepted a part-time position if health insurance coverage were provided. York maintains that it could have provided Keeney with coverage in light of her years of service to the company (even though it did not provide such coverage to Keeney's part-time replacements) [9] and that a reasonable person under the circumstances would have made a follow-up inquiry before retiring if, as Keeney contends, health insurance was Keeney's single most important concern. York maintains that Keeney's assumption that health insurance coverage would not have been provided to her is insufficient to support a finding that her job conditions were so intolerable that she was forced to retire.

Keeney urges that her assumption was a reasonable one and that the Court should not overlook the special vulnerability of a 77–year old widow who had been a switchboard operator all of her working life at the time that she was faced with the prospect of losing health insurance benefits and was told that her job was being eliminated.

9. Indeed, York contends that, because it has continued to provide health insurance coverage since her retirement, there would have been no financial reason for the company not to continue coverage.

Moreover, Keeney argues that, even if York did provide coverage and Keeney accepted the part-time position, she still would have an ADEA cause of action for the conversion of her job from full-time to part-time.

An employee given the choice between early retirement and a reduction in hours combined with a loss of health insurance benefits could conceivably raise a material issue of fact as to whether the employer has created working conditions so unpleasant or difficult that a reasonable person in the employee's shoes would resign.[10] Clearly, an employer might be able to exploit the particular sensitivities of a 77-year old widow such as Keeney. However, the law is clear that the test for constructive discharge is an objective one.

A reduction in an employee's work hours from 37 to 25 hours per week does not create conditions so intolerable that a reasonable person in the employee's position would resign where the employee *herself* has indicated that she would have continued working under these circumstances.[11] Keeney's assumption that health insurance would not be provided because of Magee's failure to respond to her initial inquiry may not have been unreasonable in the abstract. However, it cannot reasonably be argued that Keeney was *involuntarily* terminated where she *acted* on her assumption—after close to four decades of employment—without in any way verifying whether her assumption was correct.[12] Keeney argues that, "as all subordinate working people know, commonly managers, rather than say 'no' outright to a benefit request from a worker, simply say they will get back to you, and never do." However, it is unrealistic to expect that, in these circumstances, an employee will make a decision of such magnitude as the decision to retire on the basis of such an assumption without undertaking any further inquiry into the matter. In any event, the employer cannot be said to have constructively discharged the employee on the ground that the employee "assumed the worst" where there is no evidence that the employee had reason to believe that the employer would have acted as the employee assumed.

Here, because Keeney could not have known whether York would have eliminated her insurance coverage and did not even seek clarification of the insurance issue, beyond her original inquiry, before retiring, even assuming that a reasonable person in Keeney's position would have determined that the termination of health insurance coverage would have been so intolerable that she would have been justified in resigning, no reasonable jury could conclude that Keeney's working conditions were intolerable at the time she retired. Rather, the fact that Keeney did not make any further inquiry,[13] in addition to the fact that she did not complain to anyone regarding her predicament, indicates that her decision to retire was voluntary.

We also point out that York made a managerial decision which should not be second-guessed under the cover of ADEA. By creating two part-time positions in place of a single full-time position York was able to extend the hours that the switchboard was in operation and was thus able to give better service to the public. Furthermore, by setting the hourly dividing point between the two employees at 1:00 p.m. the necessity for a lunch break was eliminated and so was the need to take other employees from their work to cover the switchboard during that period. In the absence of evidence indicating that York acted with

---

**10.** It should be noted, however, that as the above discussion of *Goss, Schafer, Levendos* and *Berger* indicates, the cases which have permitted a finding of constructive discharge involved facts more egregious than the facts presented here. Of course, the mere fact that the employee was given the choice we describe would not, in itself, establish the employer's liability under the ADEA.

**11.** Though, as just indicated, the test is not subjective.

**12.** Moreover, as the district court noted, Keeney never initiated any internal grievance procedure or complained to anyone about her plight.

**13.** At least two weeks elapsed between the time Keeney was first offered one of the part-time slots and the date that she retired.

discriminatory intent we cannot understand how this reasonable business judgment can give rise to liability under the ADEA. *See Dale v. Chicago Tribune, Co.*, 797 F.2d 458, 464 (7th Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987); *Beard v. Annis*, 730 F.2d 741, 743–44 (11th Cir.1984); *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981).

### 3. Laird

We need not spend much time on Laird's claim. Although the parties vehemently disagree as to whether he was objectively qualified for his position, Laird has not demonstrated the existence of an issue of fact as to whether he was ultimately replaced by someone significantly younger to permit an inference of age discrimination. After Laird submitted his resignation, Pierce was assigned to replace him as copy editor on the day shift. Pierce's date of birth is April 27, 1939, while Laird was born on May 14, 1938.

██ Laird makes the novel argument that, although Pierce is not significantly younger in chronological years, Pierce's "age with the company was twenty-three years younger," and thus he was much cheaper to the company with respect to paid vacation and other benefits of seniority. Laird cites no support for his proposition that the ADEA protects an employee from an adverse employment decision based on *seniority* even if it cannot be demonstrated that chronological age was a factor. Indeed, it has been recognized that "seniority and age discrimination are unrelated. The ADEA targets discrimination against employees who fall within a protected age category, not employees who have attained a given seniority status." *Williams v. General Motors Corp.*, 656 F.2d 120, 130 n. 17 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *see also Arnold v. United States Postal Service*, 649 F.Supp. 676, 683 (D.D.C.1986) ("[d]iscrimination on the basis of seniority ... is not ... discrim-

ination on the basis of age"). Laird's reliance on *Metz v. Transit Mix, Inc.*, 828 F.2d 1202 (7th Cir.1987), for the proposition that fringe benefits are an unacceptable basis to justify the discharge of a senior employee, is entirely misplaced. It was only because the plaintiff was replaced by a younger employee that the court held (over a forceful dissent) that the correlation between an employee's higher salary and years of service (and therefore, usually age) prohibits an employer from justifying the employee's replacement on the basis of salary.[14]

Laird also contends that either his termination or Pierce's shift to cover for his job resulted in Laird's ultimately being replaced by a copy editor age 25 or 26. This contention is based on the fact that York's payroll listing indicates that two copy editors were hired, ages 25 and 26, less than six weeks after Laird's termination. Additionally, ten weeks *before* Laird's termination, a 22–year old copy editor was hired. The district court concluded that the evidence was "plausible" to support a claim that Laird was replaced by someone substantially younger since Pierce was also a copy editor and his position was subsequently filled by a 25–year old and 26–year old.

While we must afford Laird all reasonable inferences, there is no basis in the record for inferring that either of these two copy editors replaced either Laird or Pierce. Laird fails to mention that, at the time he was terminated, three other copy editors, ages 33, 38 and 31, were also terminated. Additionally, Pierce and another copy editor, Jerry Geist, who like Pierce was over 40 years of age, were promoted. Moreover, in his deposition, Lampe indicated that Pierce (who replaced Laird) was not replaced by anyone.

██ Recognizing, of course, "that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," *Anderson*, 477

---

14. We are not to be understood as agreeing with the majority in *Metz*. But we need not deal with that case head-on as it is distinguishable.

U.S. at 249, 106 S.Ct. at 2511, in the face of the uncontroverted evidence that three younger copy editors were terminated and others were promoted, as well as the evidence—uncontroverted in the record—that Pierce was not replaced, the fact that two young copy editors were hired by York approximately three months after Laird's termination is insufficient to raise an issue of fact for trial. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." *Id.*, 477 U.S. at 249–50, 106 S.Ct. at 2511. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991). Here, while Laird's evidence may be colorable, he has not pointed to specific evidence such that reasonable jurors could find, by a preponderance of the evidence, that Laird was ultimately replaced by someone sufficiently younger. Accordingly, since Laird has not stated a *prima facie* case the order of the district court must be affirmed.

## IV. CONCLUSION

We will affirm the orders for summary judgment of the district court in all respects. Neither Gray nor Keeney state a *prima facie* case since both voluntarily retired and neither can make out a claim of constructive discharge. Gray has not raised a disputed material issue as to the voluntary nature of her retirement since an offer of early retirement can only benefit an employee and, while it may present her with a difficult decision, the mere offer without more does not support a claim of age discrimination. The additional evidence presented by Gray does not support a claim of constructive discharge.

Similarly, there is no basis for inferring that Keeney's decision to retire was anything but voluntary. Keeney cannot be held to have been involuntarily terminated on the basis the company's elimination of health insurance benefits where she retired without verifying whether or not the company would have provided such coverage.

Laird has not stated a *prima facie* case either, since he was replaced by someone only one year younger. There is no merit to Laird's argument that he can meet this element of his *prima facie* case on the ground that he had seniority over his replacement. Additionally, although the York's records establish that two young copy editors were hired three months after Laird was terminated, in light of the evidence that York also terminated three copy editors (all under 40) and promoted two others (both over 40), under the governing summary judgment standard, there is insufficient evidence to raise an issue as to whether Laird was replaced by a younger employee.

Of course, since the appellants have not stated a claim against York, the grant of summary judgments in favor of Garden State and Media News will be affirmed without considering the separate basis for those judgments.