Amy S. BARKAUSKIE, Plaintiff,

v.

INDIAN RIVER SCHOOL DISTRICT, Indian River Board of Education, Everett C. Toomey, Dr. Charles Hudson, Reginald L. Helms, Harvey L. Walls, George H. Harrison, Richard H. Cohee, J. Everett Moore, Jr., Gregory A. Hastings, Linda L. Pusey, David W. Devine, Charles M. Bireley, Elaine McCabe, and Christine Lecates, and Edward Seibert, Defendants.

Civil Action No. 95–399 MMS.

United States District Court,
D. Delaware.

Argued July 23, 1996.

Decided Dec. 27, 1996.

Mark Minuti of Saul, Ewing, Remick & Saul, Wilmington, DE (current counsel of record); Ronald D. Phillips, Jr. of Hudson, Jones, Jaywork, Williams & Liguori, Rehoboth, DE (former counsel of record); (John P. Fenstermacher, Mark K. Emery, of Fenstermacher and Associates, Mechanicsburg, PA, of counsel), for plaintiff.

Robert K. Pearce and Edward F. Kafader of Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington, DE, for defendants.

### *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

### I. Introduction

The motions before the Court arise out of a complaint filed by plaintiff Amy Barkauskie ("plaintiff") against defendants Indian River School District (the "School District") and the Indian River Board of Education (the "Board"); and Everett C. Toomey ("Toomey"), Dr. Charles Hudson ("Hudson"), Reginald L. Helms, Harvey L. Walls, George H. Harrison, Richard H. Cohee, J. Everett Moore, Jr., Gregory A. Hastings ("Hastings"), Linda L. Pusey, David W. Devine, Charles M. Bireley, Elaine McCabe, and Christine Lecates, and Edward Seibert ("Seibert"), James A. Griffin, and Griffin & Hackett, P.A. (collectively, "defendants"). The mammoth complaint alleges a total of 58 counts against defendants, including violation of plaintiff's civil rights, defamation,

breach of contract, intentional infliction of emotional distress, and conspiracy. Docket Item ("D.I.") 79 (Amended Complaint). By order of the Court dated April 26, 1996, defendants James A. Griffin and Griffin & Hackett, P.A. were dismissed with prejudice. D.I. 125. Before the Court are three motions: plaintiff's motion to amend the amended complaint, D.I. 127; defendants' motion for summary judgment, D.I. 106; and plaintiff's motion for partial summary judgment on defendants' counterclaim, D.I. 100. Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1367.[1]

### II. Factual Background

The facts recited below, to the extent they are relevant to defendants' motion for summary judgment, are set forth in the light most favorable to plaintiff. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1297 (3d Cir.1993). Plaintiff was a former teacher and cheerleading coach at Sussex Central High School ("SCHS"), in Sussex County, Delaware. D.I. 79 ¶ 37. Toomey is the principal of SCHS. *Id.* ¶ 7. Hudson is the Superintendent of the School District. *Id.* ¶ 5. Seibert is the assistant business manager of the School District and an auditor who performed an audit on behalf of the School District of a cheerleader account over which plaintiff had control. *Id.* ¶¶ 67–68. All other named defendants are members of the Board (collectively, the "Board Members"). *Id.* ¶¶ 8–29.

In 1983, plaintiff was employed by the Board as a teacher at Sussex Central Junior High School, where Toomey served as principal. *Id.* ¶¶ 39–40. As plaintiff's supervisor, Toomey was responsible for conducting written evaluations of her. *Id.* ¶ 40–41. In February, 1983, Toomey submitted a negative evaluation of plaintiff to the Board. *Id.* ¶ 42. Plaintiff appealed the evaluation to the Board, and the Board ultimately overturned Toomey's negative evaluation. *Id.* ¶¶ 42–43.

---

1. As originally pleaded, Counts XVII through LVI alleged state law claims for defamation, intentional infliction of emotional distress, conspiracy and breach of contract. The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1367. At oral argument, plaintiff's counsel informed the Court that these claims, excluding the breach of contract claim, were actually federal claims, notwithstanding the fact that all briefing on the claims was based on state law. As noted in section III B 3, the Court holds plaintiff has not stated claims under section 1983 for defamation, intentional infliction of emotional distress and conspiracy.

As a result of the incident, plaintiff requested and was granted a transfer to SCHS. *Id.* ¶ 44. Subsequent to her transfer, Toomey confronted plaintiff and threatened to turn up in her professional life at some later date. *Id.* ¶ 45.

The terms of plaintiff's employment at the School District were set out in an employment contract entered into with the Board. *Id.* ¶ 38. The employment contract negotiated on behalf of plaintiff by the Indian River Education Association provided that teachers shall not be dismissed for arbitrary and capricious reasons and are guaranteed the full constitutional protection of due process. D.I. 108 at A-238. The contract also sets out procedures for teachers who wish to pursue a grievance, including "a violation or inequitable application of any of the provisions of this contract" (the "Grievance Procedure"). *Id.* at A-237. The Grievance Procedure provides for four levels of review, beginning with the teacher's supervisor or the principal, and ending with arbitration.

At Level One, the employee is to discuss the grievance with the principal or immediate supervisor of the employee. The principal or supervisor may meet with the employee, and shall communicate his decision to the employee in writing within a prescribed time period. Level Two permits the employee to appeal the decision within a specified time period to the Superintendent. Level Three permits the employee to further appeal the grievance to the Board. Level Four permits the employee to request arbitration with the American Arbitration Association. At every stage of this procedure, the employee is entitled to have a representative, including an attorney, present on her behalf.

During her tenure at SCHS, plaintiff had an exemplary record, and her cheerleading squad earned several awards for its abilities. *Id.* ¶ 46. Her record notwithstanding, in or about 1993, plaintiff received two anonymous letters commenting negatively on her personally, as well as in her capacity as cheerleading coach. *Id.* ¶ 47. These letters were carbon copied to the Board Members. *Id.* ¶ 48. Plaintiff informed the School District of the harassing communications and requested the Assistant Superintendent for the

School District to set up a meeting to uncover the source of these letters. *Id.* ¶¶ 49–50. The Assistant Superintendent refused her requests, and the School District, Board and Board Members took no steps to uncover their source. *Id.* ¶ 51–52. The record indicates, however, that the police were handling an investigation as to the source of the letters, but it is unclear as to who initiated the investigation. D.I. 115 at B–18 and B–21 (Deposition of John McCarthy).

In the summer of 1994, Toomey became principal of SCHS. *Id.* ¶ 53. According to plaintiff, Toomey and Hastings, a Board member, immediately instituted a course of harassing conduct directed towards plaintiff, including accusations of misuse and mismanagement of cheerleading funds, inappropriate coaching practices, questionable classroom management, and personal attacks on her character. *Id.* ¶¶ 54–55. In addition, Hastings made numerous accusations against plaintiff, allegedly based on complaints made by parents, who Hastings refused to identify. *Id.* ¶¶ 56–57. Some of these complaints concerned plaintiff's handling of a certain cheerleader account over which plaintiff had exclusive control, plaintiff's failure to obtain items from vendors which had been paid for, instances when plaintiff held her cheerleaders late after practice, and plaintiff's tendency to work the cheerleaders too hard. *See* D.I. 108 at A–78–82; D.I. 115 at B–48–53. Hastings and Toomey asked plaintiff to explain the situation in each instance in which a complaint was raised. *See id.* Plaintiff felt harassed by these questions and raised her concerns of harassment with the School District, *id.* ¶ 58, but the harassment continued, creating a working environment so hostile that plaintiff was forced to resign. *Id.* ¶¶ 59, 65. Plaintiff resigned effective October 7, 1994. D.I. 108 at A–229. Plaintiff never instituted a grievance pursuant to the Grievance Procedure, nor did she request reinstatement of her position at any time.

Subsequent to her resignation, plaintiff made numerous requests to appear before the Board to "answer any and all questions or concerns," but her requests were denied. D.I. 79, ¶ 62. At some point, Hudson, the Superintendent of the School District, or-

dered Seibert to audit the account under plaintiff's control to determine if the funds were mismanaged. *Id.* ¶ 67. According to plaintiff, these audits were conducted in a negligent manner and do not include competent evidence. *Id.* ¶¶ 69–70. Thus, the results of the audits caused Seibert to issue false statements to the Board and to the general public about plaintiff. *Id.* ¶ 68. Regardless of the veracity of Seibert's statements, SCHS was forced to pay outstanding bills to vendors who provided items for the cheerleading squad, because the account lacked sufficient funds. D.I. 115 at B–42–46.

On January 25, 1996, plaintiff was finally granted her request to appear before the Board. *See* D.I. 122. At that meeting, plaintiff issued a prepared statement reflecting her version of the events leading up to her resignation. The statement was substantially devoted to the issue of cheerleading funds mismanagement. *Id.* at C–1–11. At no point during that meeting did plaintiff request reinstatement with the Board.

Plaintiff brought an action against the School District, the Board, each individual Board Member, Toomey and Seibert, alleging numerous counts of civil rights violations as well as state law claims. The counts are as follows: (1) Counts I—XV are brought under 42 U.S.C. § 1983 against Toomey, Hudson, the School District, the Board, the Board Members in their official capacities, and Seibert, alleging a violation of plaintiff's property and liberty rights under the Fifth and Fourteenth Amendments to the United States Constitution; (2) Count XVII is brought against the Board, alleging that the Board's actions were arbitrary and capricious, in violation of plaintiff's due process rights, and thus constituted a material breach of the employment contract between plaintiff and Board; (3) Counts XVIII—XXII are defamation claims against Toomey, Hastings, the Board, the School District, and Seibert; (4) Counts XXIV—XL allege conspiracy against the School District, the Board, Toomey, the Board Members, and Seibert; and (5) Counts XLI—LVI allege claims for intentional infliction of emotional distress against the Board, the School District, Toomey, Hudson, the Board Members, and Seibert.[2]

Subsequent to the filing of this complaint, defendants filed a counterclaim for an accounting of the cheerleader account plaintiff handled. D.I. 19. The counterclaim seeks a full accounting and reimbursement to the School District of any payments it has been required to make due to the insufficiency of funds in the account.

### III. Analysis

A. *Plaintiff's Motion to Amend Amended Complaint*

Plaintiff has moved to amend the amended complaint. D.I. 127. Plaintiff filed her original complaint on June 20, 1995. D.I. 1. Plaintiff was granted leave to file an amended complaint on February 8, 1996. D.I. 78. The amended complaint, adding additional defendants Seibert, Griffin, and Griffin & Hackett, P.A., was filed on February 6, 1996. By stipulation, Griffin and Griffin & Hackett, P.A., were dismissed as parties. D.I. 125. Subsequent to filing her amended complaint, plaintiff has been able to come forward with evidence that Toomey sexually assaulted her. Accordingly, she seeks leave to file a second amended complaint to add counts relating to sexual assault, and to omit references and counts relating to former defendants Griffin and Griffin & Hackett, P.A., both of whom have been dismissed by this Court with prejudice. The counts plaintiff seeks to add are Count LVI for sexual assault; Count LVII for assault; and Count LVIII for battery. She further seeks to add language to the effect that the Board knew or should have known of Toomey's past misconduct directed towards teachers and employees in the School District.

Plaintiff argues that she has not unduly delayed in filing this motion. She argues that the reason she did not come forward with this claim earlier is that the actions of Toomey so affected her psychologically that she was not capable of coming forward with this information until re-

---

2. All counts relating to Griffin or Griffin & Hackett, P.A. are omitted from discussion, as these defendants have been dismissed with prejudice. D.I. 125.

cently. D.I. 128 at 4. In support of this contention, she submits a letter of Dr. David G. Petkash, D.I. 129, which states that plaintiff's delay in alerting others about the alleged sexual assault is consistent with normal behavioral patterns of someone who has suffered that type of trauma. She further argues that she does not bring this motion in bad faith. She notes that the claims are valid under state law, and that the Delaware Attorney General's Office has "instituted a criminal investigation of Toomey regarding these charges." *Id.* Finally, plaintiff argues that no prejudice would result to defendants if the motion were granted, inasmuch as the statute of limitations has not run on these new claims, and she could easily file them in state court. Thus, adding them to this action merely streamlines the litigation. *Id.* at 5.

Defendants oppose plaintiff's motion. D.I. 130. Defendants urge that the motion should be denied because plaintiff will be unable to prove by "substantial and convincing evidence" the occurrence of the rape at this date nearly two years after the alleged incident occurred. *Id.* at 5 (citing *Borough of Ellwood City v. Pennsylvania Power Co.,* 570 F.Supp. 553, 556 (W.D.Pa.1983)). Defendants further assert that plaintiff's newly asserted claims arise in suspicious circumstances, in that plaintiff was "finally" able to discuss the incident two weeks after a damaging report was sent to plaintiff's counsel from defendants. Defendants had hired a "certified fraud investigator" who studied the documents produced by plaintiff and concluded that many of these documents had been altered. Thus, defendants argue that the veracity of her recent disclosures is belied by the timing. Finally, defendants argue that granting the motion to amend will cause prejudice to defendants, in that discovery has been completed and case dispositive motions were filed without knowledge of these allegations.

Rule 15 of the Federal Rules of Civil Procedure embodies a liberal pleading philosophy of the federal rules. It allows a party may amend his complaint once as a matter of right, and afterwards, a "party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). *See J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 613 (3d Cir.1987). A district court has the discretion to grant or deny leave to amend. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). However, the trial court may not deny leave to amend "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Id.*

The exceptions to the liberal policy of granting leave to amend were further explained in *Adams v. Gould, Inc.,* 739 F.2d 858 (3d Cir.1984), *cert. denied,* 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1984), where the Third Circuit Court of Appeals stated:

> The passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become "undue," placing an unwarranted burden on the court, or will become "prejudicial," placing an unfair burden on the opposing party. The question of undue delay, as well as the question of bad faith, requires that we focus on the plaintiffs' motives for not amending their complaint to assert this claim earlier; the issue of prejudice requires that we focus on the effect on the defendants.

*Id.* at 868. The Third Circuit appellate court has also stated that "prejudice to the non-moving party is the touchstone for the denial of an amendment." *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993) (quoting *Cornell & Co. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir. 1978)).

Application of these principles leads to the conclusion that plaintiff's motion to amend her amended complaint will be granted. With respect to plaintiff's stated reason for the delay, there is no evidence other than defendants' bald assertion that plaintiff moves to file a second amended complaint in

bad faith. Plaintiff has given good faith reasons for the delay, supported by the opinions of treating psychiatrists. There is simply nothing in the record which demonstrates bad faith or dilatory tactics.

■ With respect to prejudice to defendants, while it is true that additional discovery will be needed, the Court does not believe this will create "undue prejudice" within the meaning of *Foman*, 371 U.S. at 182, 83 S.Ct. at 230. As plaintiff has pointed out, a trial date has not been set. Defendants will still be able to conduct discovery with respect to these additional claims. Further, all three claims relate to one alleged incident with only one of the defendants. If, in fact, plaintiff will not have any evidence to support her claims, as defendants argue, then the burden of discovery on this point will be *de minimis*. Defendants argue that prejudice will result in the sense that if a jury hears allegations of sexual assault in the context of a due process case, because of the inflammatory nature of the allegations, defendants will be unduly prejudiced in presenting their defense on the other claims. This argument is without merit. "Prejudice" for the purpose of Rule 15(a) does not concern potential prejudice resulting from the *nature* of the claims sought to be added; it concerns only the prejudice resulting from the *fact of* adding new claims at a late date. Plaintiff's motion to amend the amended complaint will be granted.

### B. *Defendants' Motion for Summary Judgment*

Defendants have filed a motion for summary judgment. D.I. 106. Defendants argue that (1) plaintiff has no due process claim under 42 U.S.C. § 1983; (2) plaintiff's claims for defamation, intentional infliction of emotional distress, and breach of contract are not cognizable under 42 U.S.C. § 1983; (3) plaintiff's lack of a federal claim requires her state claims to be dismissed; (4) plaintiff has failed to exhaust her administrative remedies for her breach of contract claim; (5) claims against the Board Members and Hudson for defamation should be dismissed; (6) claims against the Board Members and Hudson for intentional infliction of emotional distress should be dismissed; (7) claims against the

Board Members and Hudson for conspiracy should be dismissed; and (8) all claims against Lecates should be dismissed.

Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-moving party. *Conair Corp. v. Old Dominion Freight Line, Inc.*, 22 F.3d 529, 531 (3d Cir.1994).

Plaintiff's civil rights claims are found at Counts I through XV, alleging a denial of her due process rights. Plaintiff alleges that each defendant's actions "subjected and caused plaintiff to be deprived of the rights, privileges and immunities secured by the Constitutions of the United States and the State of Delaware, including, but not limited to, her protected property and liberty interests established under Amendments 5 and 14 of the United States Constitution." *See, e.g.,* D.I. 79, ¶ 78. Plaintiff asserts that she was denied due process in the periods both before and after her resignation, which plaintiff deems to be a constructive termination.

■ In order to allege a due process violation in connection with termination from employment, plaintiff must establish that she has a constitutionally protected property interest in her continued employment with the School District. Constitutionally protected property interests are created and defined by an independent source, such as state law. *Board of Regents v. Roth*, 408 U.S. 564, 567, 92 S.Ct. 2701, 2704, 33 L.Ed.2d 548 (1972); *Brown v. Trench*, 787 F.2d 167, 170 (3d Cir. 1986). Public employees who can only be terminated for cause have been deemed to possess constitutionally protected property interests in their continued employment. *Richardson v. Felix*, 856 F.2d 505, 509 (3d Cir.1988); *Brown*, 787 F.2d at 171 ("We con-

clude, therefore, that the County's just cause provision did give Brown a property right."); *Dixon v. Mayor and Council of Wilmington,* 514 F.Supp. 250, 253 (D.Del.1981) ("This Court has consistently held that public employees have a property interest if the employer has set out guidelines as to grounds for discharge.").

◼ In this case, plaintiff had a constitutionally protected property interest in her continued employment with the School District. Defendants do not dispute this fact. In her employment contract, D.I. 108 at A–230, Article IV states at note J that "[n]o teacher shall be disciplined, reprimanded, or reduced in rank or compensation for arbitrary or capricious reasons." *Id.* at A–233. Article XVIII, entitled "Fair Dismissal Procedure," sets out the teachers' rights with respect to termination. It provides:

A. The Board agrees that no teacher in the employ of the Indian River School District will be dismissed for arbitrary and capricious reasons.

B. All teachers will be guaranteed the full constitutional protection of due process.

*Id.* at A–238. The contract, therefore, sets out plaintiff's constitutionally protected property interest in continued employment, in the absence of cause for dismissal. A public employee with a constitutionally protected property interest in her continued employment cannot be denied this interest without substantive and procedural due process. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985).

◼ In order for plaintiff to prevail on her due process claims arising out of her termination from employment with the School District, she must first demonstrate that the acts and omissions of the Board, the School District, and individual Board Members constituted "termination" such that her due process rights were triggered. *Cf. Gray v. York Newspapers, Inc.,* 957 F.2d 1070 (3d Cir.1992) (plaintiff could not establish a *prima facie* case for age discrimination because she was not discharged from her employment, but rather, voluntarily elected early retirement). Because she resigned volun-

tarily, she can only prevail on this point under a "constructive termination" theory. *See id.* at 1079. Next, plaintiff must demonstrate that the Grievance Procedure afforded terminated teachers of the School District, both prior to and after that termination, does not satisfy "due process" within the meaning of the Due Process Clause. Because plaintiff has failed to make a cognizable claim for a violation of her due process rights in either the pre- or post-termination period, summary judgment in favor of defendants on Counts I through XV will be granted.

### 1. *Constructive Discharge*

◼ The Third Circuit Court of Appeals employs an objective test to determine whether an employee is constructively discharged. *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 888 (3d Cir.1984); *Levendos v. Stern Entertainment, Inc.,* 860 F.2d 1227, 1230 (3d Cir.1988). Under this test, "no finding of specific intent on the part of the employer to bring about a discharge is required for application of the constructive discharge doctrine." *Goss,* 747 F.2d at 888; *Schafer v. Board of Pub. Educ.,* 903 F.2d 243, 249 (3d Cir.1990). To prove constructive discharge, plaintiff must show that the conduct complained of would have the foreseeable result of creating working conditions that would be so unpleasant or difficult that a reasonable person in the employee's position would resign. *Schafer,* 903 F.2d at 249.

Plaintiff devotes much space in her brief to the issue of how she did not have an adequate opportunity to respond to the charges against her in the pre- and post-termination periods, employing language such as "[p]laintiff was never provided the opportunity to be heard prior to her constructive discharge." D.I. 115 at 8. However, these arguments assume as a fact an element she has failed to prove: that she was, in fact, constructively discharged. Without proof of constructive discharge, her due process arguments *a fortiori* must fail.

Cases in which constructive discharge has been found have required a high level of harassment or offensive conduct. In *Goss,* 747 F.2d 885, a female sales representative

was verbally abused by her supervisor, reassigned from her lucrative sales territory, thus causing a cut in her pay, and ultimately received an ultimatum from her employer that she accept the new assignment or resign. *Id.* at 888–89. In *Levendos,* 860 F.2d 1227, a female employee who was the only female in management was excluded from management meetings, denied authority to perform tasks men in equal positions were authorized to do, and falsely accused of stealing and drinking on the job. *Id.* at 1228. Her employer refused to discuss these problems with her, and wine bottles were placed in her locker to imply that she had stolen them. *Id.* On these facts, the court concluded she had been constructively discharged.

Cases in which no constructive discharge was found, however, have required more than the plaintiff's subjective belief that continued employment would be uncomfortable. *See Gray,* 957 F.2d 1070, 1083 (3d Cir.1992). As the Fourth Circuit appellate court stated:

> Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure h[er] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by h[er] co-workers. [Sh]e is not, however, guaranteed a working environment free of stress.

*Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985) (quoted in *Gray,* 957 F.2d at 1083), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). In *Berger v. Edgewater Steel Co.,* 911 F.2d 911 (3d Cir.1990), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991), plaintiff employees asserted they were constructively discharged when the defendant employer, which was experiencing financial difficulties, eliminated certain pension benefits. *Id.* at 923. The court rejected the argument, finding that "[t]here was nothing in the record to indicate that the Employees would have been fired had they not chosen to retire and accept the special payment." *Id.* In *Gray,* 957 F.2d at 1081, the court found no constructive

discharge where the plaintiff alleged that her decision to retire was her only choice, given that a colleague had been "forced" out of his job, another colleague had been "harassed by management" to the point where she had to take medical leave, and that she felt isolated by being offered a "secret retirement" option, had been told she was going to be removed from her favorite post, and felt deceived as to why she had been permitted to remain at that post. *Id.* at 1079. The court rejected the notion that plaintiff's subjective belief that she might get fired in the future constituted constructive discharge, *id.* at 1083, and found that like *Berger, supra,* there was nothing to indicate that she would have been fired had she chosen not to retire. *Id.* at 1082.

Plaintiff's allegations of constructive discharge include allegations that she received anonymous, harassing communications regarding her ability as cheerleading coach, D.I. 79, ¶ 47, and that when she informed the School District of these harassing communications, and requested a meeting to discuss their possible source, her request was denied. *Id.* ¶¶ 49–51. She alleges she was informed that the School District was not going to take any action, and thus the School District, Board, and Board Members failed and refused to protect her from these harassing communications. *Id.* ¶ 52.

When Toomey became principal of SCHS, plaintiff alleges he engaged in a "harassing course of conduct" against plaintiff. *Id.* ¶ 54. Such harassment included accusations of misuse and mismanagement of funds in an account plaintiff supervised, inappropriate coaching practices, questionable classroom management, and personal character attacks. *Id.* ¶ 55. Hastings also accused plaintiff on the basis of complaints made by parents. *Id.* ¶ 56. Plaintiff's repeated demands to identify the complainants were denied. *Id.* ¶ 57. Plaintiff alleges that during the summer of 1994, Toomey asked plaintiff to meet him in her office at SCHS, and then sexually assaulted her. D.I. 127, ¶¶ 56–57 (Proposed Second Amended Complaint).[3] Plaintiff

---

3. This allegation is incorporated into the constructive discharge discussion because the Court will grant plaintiff's motion to amend the amended complaint. However, there is nothing in the record pertaining to this allegation, because discovery was not conducted on the issue. At this

raised concerns of harassment to the School District, which did nothing on her behalf to remedy this situation. D.I. 79, ¶ 58. Toomey and Hastings continued a course of conduct, creating a hostile and unbearable working condition, and thereby forcing plaintiff to resign. *Id.* ¶ 59. Subsequent to her resignation, plaintiff attempted to meet with the Board to "answer any and all questions or concerns," but her requests were denied. *Id.* ¶ 62. Also subsequent to her resignation, Toomey, as well as the Board Members and School District, continued to harass and defame plaintiff. *Id.* ¶ 60. Plaintiff alleges that the Board and the Board Members knew, or reasonably should have known, that plaintiff's civil rights were being violated, that Toomey had a history of harassment directed towards teachers and employees of the School District, and that despite such knowledge, these defendants took no action to abate the improper conduct of Toomey. D.I. 124, ¶¶ 71–73.

In her deposition, plaintiff states that Toomey first harassed her by calling a meeting with her to ask some questions that were being raised by Hastings, within his first two weeks as principal. D.I. 115 at B–47. Questions included topics such as her attendance record and whether she kept cheerleaders late after class. *Id.* at B–48. Plaintiff stated that on nearly a daily basis, either Hastings or Toomey asked her questions such as:

> Was I allowing the girls to congregate in my room? Did I have the girls? Were they in the back room in my classroom standing naked, with no clothes on? What do the girls do specifically during practice? Are they being supervised entirely? What about the finances for the cheerleading squad? We never have gotten anything. What about this particular item that was ordered? What about this trip? Why are they going? Who said they were going?

*Id.* at B–50. On further examination, plaintiff revealed that in at least one instance, the complainant was a parent, rather than a school official. *Id.* at B–52–53. Plaintiff stated that she considered it harassment for Toomey to come to her and tell her about the complaint in the form of an accusation "with-

out even giving [her] an opportunity to even speak. And then when they found out that it wasn't even so, it was never: I apologize." *Id.* at B–54. Plaintiff alleges on another day, Toomey came to her and told her he feared she was "forming a cult" with the cheerleaders, that she has "brainwashed these girls, and it is not healthy for these students to be in this kind of an environment." *Id.* at B–55. Plaintiff states she asked for a meeting with the students and the parents to clear up these complaints, but Toomey refused to set up the meeting. *Id.* at B–56. However, John McCarthy ("McCarthy"), the supervisor of secondary education, testified that plaintiff "held many parent meetings," and that plaintiff did not ask school officials to set up meetings "because she did it herself." McCarthy added, "I don't recall her ever asking us to do that." *Id.* at B–19–20.

Plaintiff also describes a conversation where someone came to her to tell her that accusations were being made about improprieties in her handling of the cheerleading fund, and that person said "they are out to get you," "this is a witch hunt." *Id.* at B–57. The record is not clear who was speaking to plaintiff at the time. Plaintiff alleges Toomey's harassment is further evident because he told the cheerleading squad that plaintiff was resigning because she didn't care about the girls, that she dropped them during the school year, and that there were reasons unknown to the girls for her resignation. *Id.* at B–59.

Plaintiff further alleges Toomey harassed her by challenging her coaching practices. In addition to his calling her squad a "cult," she alleges Toomey reprimanded her for the fact that some of the girls were kept late on a day on which an outside instructor came in to coach the girls. *Id.* at B–60–61. Those are the only two incidents supporting this allegation. Incidents she recalls which support her allegation that Toomey accused her of questionable classroom management include a comment he made to the effect of "I guess you are going to have to prove [yourself] to me in the classroom," *id.* at B–62, and an accusation of the "disruptive nature of [her] classroom," *id.* at B–63, which arose out

juncture, the Court will assume the allegation to be true.

of the fact that certain cheerleaders were congregating in the back of the classroom, an issue plaintiff was able to resolve.

> Counsel for Defendants: Was that what Dr. Toomey was bringing to your attention? The accusation had been about cheerleaders congregating in the classroom?
>
> Plaintiff: Right. And I believe I proved to him otherwise, because I also asked Mr. Battaglino to address the subject.
>
> Q. But you considered the fact that Dr. Toomey raised that question with you as being harassment?
>
> A. Without making any investigation, it was. I think you should make sure you don't allow cheerleaders in here any longer. That wasn't what was taking place.
>
> Q. Any other instances where you think Dr. Toomey was harassing you by questioning your classroom management?
>
> A. Not that I can recall.

*Id.* at B–66.

Plaintiff further argues that constructive discharge can be demonstrated by testimony that Toomey and Hastings had a plan to "finish off" plaintiff. McCarthy testified to his knowledge of the events concerning plaintiff's resignation. He stated that on one occasion, Toomey came out of his office and "just announced, [he had] just been on the phone with Greg Hastings, and he was talking to [him] about finishing off Amy Barkauskie." D.I. 115 at B–6. From that statement, McCarthy inferred that Hastings had "something ... out for Amy." *Id.* at B–7. Toomey's statement was also overheard by another. *Id.* at B–36. McCarthy also testified that on one occasion, Hastings monitored plaintiff's classroom from the back of the class. *Id.* at B–9–10.

Plaintiff's receipt of anonymous letters will not be considered in the constructive discharge analysis, as there is nothing in the record which remotely imputes to defendants the authorship of these harassing communications. Similarly, plaintiff's requests to speak to the Board to answer questions subsequent to her resigning will also not be considered; actions taken after her resignation have no bearing on the constructive discharge inquiry. Further, allegations that Toomey and Hastings had a plan to "finish off" plaintiff are not material to the issue of constructive discharge. The Third Circuit Court of Appeals has adopted an objective test to determine constructive discharge. *See Goss,* 747 F.2d at 888; *Levendos,* 860 F.2d at 1230. Under this test, the subjective intent of the employer to bring about a discharge is not relevant to the constructive discharge inquiry. *Goss,* 747 F.2d at 888.

Distilled down to their most basic elements, plaintiff's allegations of constructive discharge based on actions taken by defendants are as follows: (1) defendants' collective failure to take steps to help her when she was harassed by anonymous letters; (2) a continued practice of Toomey and Hastings of bringing financial and other complaints made against her to her attention and seeking explanations, coupled with the offense she takes from his practice of "accusing" her, rather than styling the query in the form of a complaint, *see id.* at B–53 ("He didn't put it in the form of a complaint. It was an accusation."); (3) Hastings' act of monitoring her class on one occasion; and (4) the alleged sexual assault.

 Applying the objective test, the Court concludes there is an issue of fact as to whether any of this alleged conduct created a working environment so "unpleasant or difficult that a reasonable person in [her] position would resign." *See Schafer,* 903 F.2d at 243 (material issue of fact existed as to reasonableness of male teacher's decision to resign after requesting paternity leave, informing the board he would resign if leave were not granted due to his inability to obtain appropriate child care, and was then denied leave). While allegations of a practice of Toomey and Hastings of coming to plaintiff with complaints and seeking explanations may have offended her, there is nothing in the record which indicates that plaintiff would have been fired had she chosen not to resign, as in *Gray* and *Berger, supra.* Similarly, Hastings' presence in her classroom on one occasion does not suggest plaintiff would have been fired had she not chosen to resign. Additionally, defendants' failure to take steps to protect plaintiff from harassing letters,

without more, does not amount to constructive discharge. First, the record only indicates that there were two such letters sent. Second, plaintiff provided the testimony of McCarthy to the effect that the police were investigating the letters. As McCarthy himself testified, "We talked [to the police] about ... the letters and, you know, the police officer and I both concluded that it was a lot of childish nonsense. *We had more important things to do as educators* and police officers." D.I. 115 at B–21 (emphasis supplied).

■ The sexual assault, however, is another matter. If plaintiff has sufficient record support she was sexually assaulted, plaintiff would have made her case for constructive discharge. *See, e.g., Levendos,* 860 F.2d 1227 (female management employee denied right to attend management meetings attended only by men, and denied authority to perform tasks men in equal positions were authorized to do, made case for constructive discharge). Having established an issue of fact as to whether plaintiff was constructively discharged, the Court now turns to the issue of whether plaintiff has made a colorable claim for a violation of her due process rights in connection with her constructive discharge.

### 2. *Due Process Claims*

Plaintiff does not specify whether the alleged due process violation occurred before or after she resigned. She complains that accusations were continually made against her while still employed, and further complains that her requests to speak to the Board were denied after she resigned. The court will examine both the pre- and post-termination procedures in consideration of her due process challenge.

#### a. *Pre–Termination Procedures*

■ An essential principle of due process is that a "deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493 (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950)). Due process fundamentally requires that the individual be given an opportunity for a hearing *before* she is deprived of her property interest. *Id.* This principle requires "some kind of hearing" prior to discharge. *Id.*

> The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*Id.* at 546, 105 S.Ct. at 1495 (citations omitted). The purpose of the hearing is to provide an initial check against mistaken decisions and a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. *Id.* at 545–56, 105 S.Ct. at 1495. It need not be elaborate, and it can vary, depending on the importance of the interests involved and the nature of the subsequent proceedings. *Id.* at 545, 105 S.Ct. at 1495.

■ Where a discharged public employee is given notice of the charges, an adequate explanation of the evidence, and an adequate opportunity to present his side of the story, his due process rights are not violated. *McDaniels v. Flick,* 59 F.3d 446 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996). The employee need not be informed of all the evidence, but must be given a meaningful opportunity to respond in the sense that he must know the substance of the case the employer has against him. *Id.* "We have held, however, that pre-termination notice of the charges and evidence against an employee need not be in great detail as long as it allows the employee 'the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or

in denial of the charges.'" *Id.* at 457 (quoting *Gniotek v. City of Phila.,* 808 F.2d 241, 244 (3d Cir.1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987)); *see also Fraternal Order of Police, Lodge No. 5 v. Tucker,* 868 F.2d 74, 79 (3d Cir.1989) ("The pretermination hearing may be informal so long as it affords the employee an opportunity to made any 'plausible arguments that might ... prevent [the] discharge.'") (quoting *Loudermill,* 470 U.S. at 544, 105 S.Ct. at 1494); *see also Edmundson v. Borough of Kennett Square,* 4 F.3d 186, 193 (3d Cir.1993) (employee's pre-termination due process rights satisfied by meeting with mayor and members of city council, at which meeting specific charges forming the basis for his dismissal were explained, and an opportunity for employee to explain his behavior was given).

■ Applying these principles to the case *sub judice,* the Court concludes that plaintiff's pre-termination due process rights were satisfied. The gravamen of plaintiff's complaint regarding the course of conduct against her during the period leading up to her resignation is that Toomey and Hastings made accusations against her before investigating whether they were true, failed to apologize upon discovery when they were false, questioned her every move with respect to her cheerleaders and the cheerleader fund, failed to disclose the names of the complaining parents, refused to call a meeting with parents to discuss the complaints, and prevented her from meeting with the Board.

However, due process in the period prior to termination requires only notice of the charges and an opportunity to respond. *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493. Plaintiff was granted both requirements. By plaintiff's own admission, in every instance in which someone complained about her, Toomey and Hastings questioned her about the complaint and asked for an explanation. Whenever concerns were raised regarding plaintiff's handling of the cheerleading fund, there is no question she was called upon for an explanation, and at times, called to provide extensive paperwork, including receipts, canceled checks and deposit slips.

Plaintiff: Then the situation persisted. As soon as Dr. Toomey was there, he hadn't even been in the building a week, and Mr. Hastings has another conversation with now the acting principal, Dr. Toomey. And they are, once again, requesting explanations to this, explanations to that, and I said I would be more than happy to.

I came in as soon as I returned home from Pennsylvania and brought everything that he asked for me to bring, all the originals.

Counsel for Defendants: Let me back up there. What did he ask you to bring?

A. He asked me to bring with him [*sic*] proof that I had paid for a candy fundraiser, for all the information that I had on all the seat cushions, and the status of some duffel bags that we had ordered....

When I came in, I brought the following: A statement from the candy company stating that the bill had been paid, every piece of original part of the seat cushions information, along with the invoice, along with the canceled check.

D.I. 115 at B-51. Plaintiff later stated:

Plaintiff: Okay. After the school began, which was in September, he now started on another daily basis of coming over and why this and why that. And never did he come over and—

Counsel for Defendants: Why? Can you be more specific?

A. I will. And he would say to me: I got another phone call from Mr. Hastings. Marti McCabe had said you had taken a check for $38.50 that was written for a turtleneck. You took that check, signed the check, and deposited it into your personal checking account. I said: Dr. Toomey did either you or Mr. Hastings ask to see this check? No. But you are taking her word and coming and asking me that I deposited this check? Well, I just would like to know. I said: I would be more than happy to tell you where it is.

We walked over to the office and I said to Barb Lowe: Please take all deposit slips or the checks deposited into the school's account. I told her to find the check for $38.50. Guess which check was on that

roster? Did I receive an apology? Did Mr. Hastings follow up a little more on his accusations?

*Id.* at B–52–53.

When parents complained plaintiff held their children late, plaintiff was called on for an explanation. *Id.* at B–60–61. When plaintiff was told she had too much commotion in her classroom, or that students were improperly congregating in her classroom, plaintiff was notified and asked to explain. *Id.* at B–66. In sum, in *every instance* in which she complains she was being questioned, the fact remains that she was being asked for explanation. Thus, an opportunity to respond was provided in each case, belying her claim that she was never allowed to present her side of the story. It is undisputed by all parties that plaintiff was constantly notified about complaints and required to explain. Therefore, plaintiff's due process challenge with respect to the pre-termination period must fail.

### b. *Post–Termination Procedures*

 With respect to a due process challenge in the post-termination period, a constitutional violation actionable under section 1983 "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon v. Burch,* 494 U.S. 113, 126, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990). In the case *sub judice,* therefore, a cause of action for a due process violation does not accrue at plaintiff's constructive discharge; it accrues when plaintiff seeks to grieve her termination, and is denied that opportunity. As the Third Circuit appellate court stated in *McDaniels v. Flick,* 59 F.3d 446, 459 (3d Cir.1995):

[A] discharged employee cannot claim in federal court that he has been denied due process because his pretermination hearing was held by a biased individual where he has not taken advantage of his right to a post-deprivation hearing before an impartial tribunal that can rectify any possible wrong committed by the initial decisionmaker.

*Id.* at 460. Thus, where the public employer provides post-termination procedures, the employee is not deprived of due process "un-less and until the state refuses to provide due process." *Id.* (quoting *McKinney v. Pate,* 20 F.3d 1550, 1562 (11th Cir.1994) (in banc), *cert. denied sub nom. McKinney v. Osceola County Bd. of County Comm'rs,* —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995)).

The Third Circuit Court of Appeals in *Dykes v. Southeastern Pa. Trans. Auth.,* 68 F.3d 1564 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1434, 134 L.Ed.2d 556 (1996), struck a due process challenge brought by a dismissed employee on facts similar to those in the case *sub judice.* There, employees, pursuant to a collective bargaining agreement, had a three-level grievance procedure available to pursue grievances against their employer. *Id.* at 1571. Arbitration was further available as a fourth step in the grievance procedure if the matter were still unresolved. *Id.* The court held that plaintiff's failure to pursue arbitration as the fourth level of review of his grievance precluded him from bringing a due process challenge.

Significantly, [plaintiff] could have asked a court of common pleas to order arbitration pursuant to the collective bargaining agreement, thereby assuring him of the due process to which he was entitled. Because he chose not to do so, [he] is unable to prove a violation of 42 U.S.C. § 1983....

*Id.* at 1572.

 In this case, there is no dispute that plaintiff could have availed herself of the procedures in the Grievance Procedure. *Cf. Parratt v. Taylor,* 451 U.S. 527, 543, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1980) ("This procedure was in existence at the time of the loss here in question but respondent did not use it."), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The Grievance Procedure sets out four levels of review to address and rectify grievances raised by teachers. Resort can be had to the Grievance Procedure not only for grievances related to termination, but for any "violation or inequitable application of any of the provi-

sions of [the employment] contract."[4] D.I. 108 at A–237. At Level One, the employee is to discuss the grievance with the principal or immediate supervisor of the employee. Level Two permits the employee to appeal the decision within a specified time period to the Superintendent. Level Three permits the employee to further appeal the grievance to the Board. Level Four permits the employee to request arbitration with the American Arbitration Association. At every stage of this procedure, the employee is entitled to have a representative, including an attorney, present on his behalf.

Plaintiff concedes that her employment contract contains the various administrative remedies for employees with grievances, and sets forth a procedure which culminates in arbitration. However, she dismisses resort to these procedures as futile: "Unfortunately, the remedies available to Plaintiff were to go to her Principal, the Administrator, and the Board. As these are the exact individuals who created the problems, and are now parties to the lawsuit, such efforts would have been futile." D.I. 115 at 8. This argument is flawed in two respects. First, these people are only parties to a lawsuit because plaintiff has sued them; had she resorted to the administrative procedures in a timely fashion, the lawsuit might not have arisen. Secondly, and more importantly, in *any* case in which a teacher is pursuing a grievance under the Grievance Procedure, especially in cases in which the grievance is an allegation of unfair termination, the principal, administrator and/or the Board will be the ones who, in the teacher's eyes, "created the problems," if for no other reason than that those officials are the ones who fired the teacher. Thus, if the Court accepts plaintiff's argument, it will also, in effect, strike the entire Grievance Procedure as invalid. Plaintiff simply cannot refuse to pursue her grievance through the established procedures, and then complain that she was denied due process. *See McDaniels,* 59 F.3d at 460 ("[A] discharged

employee cannot claim in federal court that he has been denied due process ... where he has not taken advantage of his right to a post-deprivation hearing....").

Plaintiff further argues that although the Grievance Procedure is available to her, it does not constitute due process because while she never pursued a grievance, every step in the process would have been biased against her in any event. She argues that Levels One and Two would have been futile because Toomey had a plan to get rid of her. She then argues that Level Three would have served no useful purpose because everyone on the Board is dominated by Hastings, and Hastings also had a plan to get rid of her. There is absolutely nothing in the record to support that allegation. Then, plaintiff argues that even the arbitration procedure at Level Four would not have solved her problems because the recommendation of the arbitrator is nonbinding. This argument cannot be seriously entertained. Further, no party disputes that plaintiff could bring an action in court alleging a due process violation if she feels the process afforded her was not "due process" within the meaning of the Due Process Clause. Plaintiff's problem is that she seeks to bring this action before testing the process.

Plaintiff argues she was denied due process in that her requests to clear her name by speaking to the Board were denied, thus denying her the opportunity to defend herself against the complaints. However, her requests to speak with the Board were made after she resigned. Even then, she was not denied an opportunity to grieve her constructive termination because she never requested such opportunity. Her request to speak with the Board regarding the complaints made about her alleged mismanagement of the cheerleading fund did not pertain directly to what she claims was constructive termination. To the extent plaintiff argues that the Board was derelict in its duties in resolving the alleged harassment by Toomey prior

---

**4.** Plaintiff has also filed counts arising out of the alleged sexual assault. The Court does not decide whether sexual assault, assault, and battery would be covered under the Grievance Procedure. However, whether plaintiff would have to bring these allegations through the Grievance Procedure is not an inquiry relevant to the due process challenge; plaintiff's claims arising out of the alleged sexual assault stand independent of whether the Grievance Procedure afforded her due process.

to her termination, it bears repeating that plaintiff never filed a grievance concerning the alleged harassment. Thus, the Board was not presented with the grievance. As McCarthy testified, "Board members are supposed to be the appeal body if a teacher ... appeals an administrative personnel decision above the administration of, of the particular school. The appeal body is ... the superintendent and then ultimately the school board, and so if a school board member gets in on a personnel issue early on, it violates that individual teacher's right to appeal." D.I. 115 at B–15.

Further, when her request to address the Board was finally granted, and the meeting was held, the record does not demonstrate that the purpose of this meeting was to grieve her constructive termination. The entire meeting was devoted to explaining and answering questions regarding her management of the cheerleading fund. *See* D.I. 122 at C–1–11. In fact, her statement made to the Board, which was incorporated into the minutes of the meeting, contains no indication that plaintiff desired to be reinstated or sought review of the constructive termination. Accordingly, the Court holds that plaintiff has failed to make out a due process claim against defendants. Defendants' motion for summary judgment on Counts I through Count XV will be granted.

3. *Claims for Defamation, Intentional Infliction of Emotional Distress, Conspiracy and Sexual Assault*

■ In supplemental briefing, the parties addressed whether plaintiff's claims for defamation, intentional infliction of emotional distress, conspiracy and sexual assault could be brought as federal claims under 42 U.S.C. § 1983. "In order to establish a section 1983 claim, a plaintiff 'must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law.'" *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996) (citations omitted).

*a. Defamation*

■ Plaintiff correctly notes that defamation can give rise to a federal claim under section 1983. *See Nelson v. City of McGehee*, 876 F.2d 56 (8th Cir.1989). However, because "[t]here is no federal constitutional right to reputation," *Kulwicki v. Dawson*, 969 F.2d 1454, 1468 (3d Cir.1992), allegations of defamation alone do not suffice to form a section 1983 claim. *See Paul v. Davis*, 424 U.S. 693, 702, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1970).

■ The Supreme Court has held "defamation is actionable under 42 U.S.C. § 1983 only if it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution." *Clark v. Township of Falls*, 890 F.2d 611, 619 (3d Cir.1989) (*citing Paul*, 424 U.S. at 701–12, 96 S.Ct. at 1160–66). Such cases implicate the constitutional guarantee of due process. *Id.* Lower courts have called the showing required to bring a section 1983 claim for defamation "stigma plus." *See Defeo v. Sill*, 810 F.Supp. 648, 656 (E.D.Pa.1993) ("Unless coupled with a tangible injury such as the loss of employment or extinction of a vested right recognized by state law, defamation by state officials is not actionable under § 1983."); *accord Libertelli v. Parell*, No. 86–2752, 1989 WL 43662, at *3 (D.N.J. March 21, 1989).

■ Once a plaintiff has shown "stigma plus," he or she also must show that the provided notice and opportunity to be heard were inadequate to satisfy the requirements of due process. In this context, courts have found individuals must be given an opportunity to refute the charge. *Nelson*, 876 F.2d at 58. Stated differently, the allegedly defamed individual is not deprived of due process if he or she is afforded a "name clearing" hearing. *Id.* at 57. Moreover, "'[b]ecause it is provided simply to cleanse the reputation of the claimant, the [name clearing] hearing need not take place prior to his termination or to the publication of related information adverse to his interests.'" *Foster v. Jackson County*, 895 F.Supp. 301, 304 (N.D.Fla.1995) (*quoting Campbell v. Pierce County, Georgia*, 741 F.2d 1342, 1345 (11th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985)).

Plaintiff's argument in the present case focuses on the lack of a name clearing hearing, without addressing her required showing of "stigma plus." She alleges defendants informed certain vendors that plaintiff "victimized" both the School District and the vendors, that plaintiff forged letters of authority and that she "skipped town" with the School District's money. D.I. 135, at 3.[5] Further, plaintiff states, defendants accused her of creating a cult with the cheerleaders, as well as other, unspecified "defamatory statements." *Id.* at 4. In all these cases, plaintiff maintains, she was not given the opportunity to refute these charges before the defendants, the School Board or the vendors. *Id.* at 4–5. Defendants, on the other hand, argue plaintiff's claim of defamation is a state claim and does not give rise to a federal claim under section 1983. D.I. 136, at 10.

Like plaintiff, the Court also will not focus on whether plaintiff's claim of defamation coupled with a constructive discharge amounts to "stigma plus," because regardless, plaintiff was afforded a name clearing hearing and thus cannot maintain her due process claim.

 As noted in the prior section regarding plaintiff's alleged constructive discharge, plaintiff was given the opportunity to respond to a myriad of charges against her. In light of what has been set forth earlier in this opinion, it suffices to quote just a brief passage from plaintiff's deposition:

As soon as Dr. Toomey was there, he hadn't even been in the building a week, and Mr. Hastings has another conversation with now the acting principal, Dr. Toomey. And they are, once again, requesting explanations to this, explanations to that, and I said I would be more than happy to.

D.I. 115, at B–50 to 51. With respect to the specific statements alleged to be defamatory, it is absolutely clear, by plaintiff's own admission, that she was confronted and responded to the "cult" accusation. *See id.* at B–55. Moreover, the allegations that plaintiff mismanaged the cheerleading accounts—

which form the basis for any communication with vendors that plaintiff "victimized" the School District and the vendors—plaintiff was permitted to appear before the Board and speak to those charges on January 25, 1995. *See* D.I. 122, at C–1 through C–11 (transcript of executive session minutes). Finally, plaintiff admits a grievance procedure was available for her to complain about the allegations of fiscal mismanagement, however, she did not take advantage of it because she felt under too much emotional strain. D.I. 108, at A–242.

Plaintiff maintains, however, she was unaware of the specific statements made to the vendors until the initiation of this litigation, and therefore she could not possibly have been given the opportunity to respond nor could she have utilized the grievance procedure with respect to these particular statements made to the vendors. D.I. 135, at 5. The Court is not persuaded this amounts to a violation of plaintiff's due process rights. The process plaintiff was due was an opportunity to clear her name, which she was given. Her due process rights do not require she be given notice before each allegedly defamatory statement is made, especially when the statements relate to an underlying situation about which plaintiff has had notice, and has responded to. Her due process rights are not violated because defendants, unconvinced by plaintiff's attempts to clear her name, persist in making uncomplimentary statements about her. Plaintiff therefore has not pointed to a violation of her constitutional rights, and summary judgment will be granted for defendants on her section 1983 claim for defamation.

### b. Intentional Infliction of Emotional Distress

Barkauskie argues "[t]he same operative facts" leading to her constructive discharge also give rise to her claims for intentional infliction of emotional distress. D.I. 135 at 5. "As such," she continues, "this state law claim rises to the level of a federal claim under 42 U.S.C. § 1983." *Id.* at 5–6. Plain-

---

**5.** The record actually is unclear whether defendants said plaintiff forged a letter of authority or that she "skipped town;" however, it is clear

defendants said plaintiff victimized defendants and the vendors.

tiff has cited no authority for this proposition.

 Although there is not much law on this issue, what little law there is indicates plaintiff may not bring a claim under 42 U.S.C. § 1983 solely for intentional infliction of emotional distress. *See Sergio v. Doe,* 769 F.Supp. 164 (E.D.Pa.1991). Section 1983 " 'imposes liability for violation of rights protected by the Constitution, not for violations of duties of care arising out of tort law.' " *Id.* at 166 (*quoting Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). Plaintiff has in no way explained how intentional infliction of emotional distress is a violation of any right secured to her by the Constitution or federal law. It is not enough to allege that it arises from the same operative facts as another alleged constitutional violation—such claims potentially may be brought in a federal court only pursuant to its supplemental subject matter jurisdiction.[6] *See* 28 U.S.C. § 1367(a). Summary judgment will be entered against plaintiff on her intentional infliction of emotional distress claim.

### c. Conspiracy

 Plaintiff's conspiracy claim, alleged pursuant to section 1983, "is based upon Plaintiff's claim that the Defendants conspired to violate her federally protected civil rights." D.I. 135, at 6. Section 1983, however, "does not provide a cause of action per se for conspiracy to deprive one of a constitutional right." *Defeo v. Sill,* 810 F.Supp. 648, 658 (E.D.PA.1993). "[C]ivil conspiracy is [merely] a vehicle by which § 1983 liability may be imputed to those who have not actually performed the act denying constitutional rights." *PBA Local No. 38 v. Woodbridge Police Dep't,* 832 F.Supp. 808, 832 n. 23 (D.N.J.1993). As a result, "a § 1983 conspiracy claim is not actionable without an actual violation of § 1983." *Id. Accord Thompson v. City of Lawrence, Kansas,* 58 F.3d 1511 (10th Cir.1995); *Hale v. Townley,* 45 F.3d 914 (5th Cir.1995); *Goldschmidt v. Patchett,* 686 F.2d 582 (7th Cir.1982).

Summary judgment will be granted on all plaintiff's section 1983 claims. Without these underlying violations, no conspiracy claim may be brought. Summary judgment will therefore be granted for defendants on plaintiff's section 1983 claim of conspiracy.

### d. Sexual Assault, Assault and Battery

As rehearsed previously, the Court grants Barkauskie's motion to amend her complaint a second time to add claims of sexual assault, assault and battery. Also as noted above, plaintiff's counsel at oral argument informed the Court such claims actually were federal claims under 42 U.S.C. § 1983, despite that they were not pled as such in the proposed second amended complaint. In plaintiff's brief, it was asserted "An assault and battery violates an individuals [sic] right to be secure in one's person, an aspect of the rights protected by the Fourteenth Amendment." D.I. 135, at 7.

Defendants urge the Court to hold as a matter of law Barkauskie's claims are not cognizable under section 1983. According to defendants, "there is no 'special relationship' which existed between Ms. Barkauskie and Dr. Toomey in the instant case" that would give rise to claims of a violation of substantive due process. D.I. 136, at 18–19. Defendants further assert:

> [T]he assault and sexual assault which [plaintiff] alleges simply does not give rise to a claim that a constitutionally created right was violated. If this Court should hold that Ms. Barkauskie might be able to prove a § 1983 claim in this case . . . any claim of an undesired physical contact by a State actor would give rise to a § 1983 claim.

*Id.* at 19.

 Although defendants have filed a motion for summary judgment that addresses Barkauskie's sexual assault, assault and battery claims, the Court finds it is unable to

---

**6.** This is not to say that a plaintiff cannot recover under section 1983 for emotional distress *stemming* from a violation of his or her rights as secured by the Constitution or federal law, *see Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). It is merely held that plaintiff can not state a claim under section 1983 based on intentional infliction of emotional distress alone.

dispose of these claims on summary judgment. As plaintiff was unable emotionally to come forward with information about the sexual assault until recently, the Court has available to it only plaintiff's amended complaint. It does not have depositions, answers to interrogatories, admissions on file or affidavits, as contemplated by Rule 56(c), with which to determine whether any disputed issues of material fact exist. The Court will treat defendants' motion as a motion to dismiss.

In deciding the motion, therefore, the Court must accept all of the allegations in Barkauskie's complaint as true, and additionally, draw all reasonable inferences from the facts alleged in the complaint. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir.1994); *Finch v. Hercules Inc.*, 809 F.Supp. 309, 310 (D.Del.1992). "Unless the plaintiff can prove no set of facts in support of the claim that would entitle [the plaintiff] to relief, the complaint should not be dismissed." *ALA, Inc.*, 29 F.3d at 859. It is worth reiterating a section 1983 claim has two elements: (1) a violation of a right secured by the U.S. Constitution or federal law, and (2) action under color of state law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996).

■ Plaintiff's allegations that Dr. Toomey sexually assaulted her suffice as an assertion her constitutional right to bodily integrity was violated. *See Planned Parenthood v. Casey*, 505 U.S. 833, 849, 112 S.Ct. 2791, 2806, 120 L.Ed.2d 674 (1992) ("It is settled now ... that the Constitution places limits on a State's right to interfere with ... [a person's] bodily integrity."); *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 269, 110 S.Ct. 2841, 2846, 111 L.Ed.2d 224 (1990) ("Before the turn of the century, this Court observed that

'[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person....'") (quoting *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891)); *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 479 (9th Cir.1991) (plaintiffs who were raped by state employee were deprived of constitutional rights); *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir.1989), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) (student who was sexually assaulted by her teacher had a well-established constitutional right "to freedom from invasion of her personal security through sexual abuse.").[7]

■ However, in addition to a violation of a right secured by the Constitution, plaintiff also must allege that defendant acted under color of state law. This element of the claim addresses defendants' concern that section 1983 not be interpreted to federalize all state law tort claims committed by state officials. The requirement that the defendant act under color of state law is frequently satisfied by the actor's status as a state employee. However under color of law is not satisfied if the act complained of is not committed through abuse of state-supplied power.

The Third Circuit appellate court recently explained the contours of "under color of law" in *Mark v. Borough of Hatboro*, 51 F.3d 1137 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995), a case brought against a volunteer fire company and the borough in which it was located for arson committed by a volunteer firefighter. The appellate court affirmed judgment for defendants, which rested partially on a find-

---

7. The Supreme Court may further opine on the constitutional right to bodily integrity, in a slightly different context, when it decides *United States v. Lanier*, 73 F.3d 1380 (6th Cir.), *cert. granted*, —— U.S. ——, 116 S.Ct. 2522, 135 L.Ed.2d 1047 (1996). One of the questions presented is "Whether, for purposes of 18 U.S.C. § 242, the right secured by the Due Process Clause of the Fourteenth Amendment to be free from a wholly unjustified interference with bodily integrity by a sexual assault by a state official acting under

color of law has been made specific within the meaning of *Screws v. United States*, 325 U.S. 91 [65 S.Ct. 1031, 89 L.Ed. 1495] (1945)." The statute 18 U.S.C. § 242 criminalizes intentional deprivation of another's constitutional rights; *Screws* held in order for such conduct to be punished under criminal sanctions, the right deprived must be "made specific either by the Constitution or laws of the United States or by decisions interpreting them." *See* Petitioner's Opening Brief, 1996 WL 469133.

ing that the firefighter was not acting under color of law when he set a fire destroying the plaintiff's business. Relying on U.S. Supreme Court authority, the court explained:

> It is well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state. Rather, in order for the tortfeasor to be acting under color of state law, his act must entail "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."

*Id.* at 1150 (*quoting United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). The court continued " '[U]nder color of law' means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded." *Id.* at 1151 (*quoting Screws v. United States,* 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495 (1945)).

■ Similarly, sexual harassment of one state employee by her co-workers falls on the side of personal pursuits rather than acts under color of law. *See Murphy v. Chicago Transit Auth.,* 638 F.Supp. 464 (N.D.Ill. 1986). "[A]ctions taken under color of state law must be related to the state authority conferred on the actor, even though the actions are not actually permitted by the authority." *Id.* at 468. The pretense of state authority "is lacking if the wrongful acts are not in any way related to the performance of the duties of the state employee." *Id.* at 467. *Cf. Hughes v. Halifax County Sch. Bd.,* 855 F.2d 183 (4th Cir.1988) (misconduct of a non-sexual nature not action under color of law).

The Ninth Circuit's opinion in *Dang Vang v. Vang Xiong X. Toyed,* 944 F.2d 476, upholding a jury's determination that defendant acted under color of state law, is not inconsistent with this analysis. Defendant, an employee of the state department of employment security, raped two women who sought assistance from him in finding a job. First, because of the procedural posture of the case, the appellate court was limited to deciding "whether there was *any* evidence to support the jury's verdict...." 944 F.2d at 479 (emphasis added). The court found the defendant "came into contact with [plaintiffs]

because of his state employment"; and further, in the case of at least one of the plaintiffs, raped her while they were together under the guise of preparing for plaintiff's driver's license exam. In other words, the defendant used his authority under the state to violate the plaintiffs' constitutional rights.

■ This authority demonstrates the inaccuracy of defendants' position that plaintiff's claim must fail in the absence of a "special relationship" between herself and defendants. If Barkauskie's allegations demonstrate she was raped by one acting under color of state law, she has stated a claim under section 1983. The concept of a special relationship, on the other hand, is utilized to hold the state liable for failure to protect a citizen from a constitutional injury by one who is *not* acting under color of state law. *See D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1369 (3d Cir.1992) (en banc) ("[W]hen the state enters into a special relationship with a particular citizen, it may be held liable for failing to protect him or her from the private actions of third parties."), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *see generally DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In such a case, it is necessary to allege a special relationship because a state actor does not violate the rights of a private citizen by failing to protect him or her from harm; in other words, "the Due Process Clause does not impose an affirmative duty upon the state to protect its citizens." *D.R.,* 972 F.2d at 1367. In the Third Circuit, a special relationship arises when a private citizen is placed in involuntary physical custody of the state, which is clearly not the setting of this case. *See id.* at 1372–73 (holding no special relationship exists in the context of a school and students).

■ Defendants' special relationship argument begs the true question in this case— whether Dr. Toomey acted under color of state law when he allegedly committed sexual assault. The allegations in Barkauskie's proposed second amended complaint are bare with respect to this question; she merely states he was Principal of the Sussex Central

High School and an employee of the School District. The Court therefore holds in light of the above-cited authority, Dr. Toomey was not acting under color of state law if he committed the alleged sexual assault of plaintiff. Unlike the prison guard or the police officer who uses excessive force in the course of his or her authorized duties, the alleged sexual assault would be in no way related to the state authority conferred on Dr. Toomey—an educator. The alleged assault "had nothing to do with, and bore no similarity to, the nature of [a high school principal's] job." *Murphy*, 638 F.Supp. at 468. It was a purely personal act. Therefore, plaintiff's asserted federal claim for sexual assault will be dismissed.[8]

## C. *Defendants' Motion for An Accounting*

Defendants have collectively filed a counterclaim for an accounting of the cheerleader account maintained by plaintiff, in which she deposited funds collected from the cheerleaders, parents, and other contributors. D.I. 19. The counterclaim alleges plaintiff maintained sole control over the account. *Id.* at ¶ 295. The counterclaim further alleges that plaintiff has denied defendants' numerous requests to account for the funds therein and to produce the documents necessary to support such accounting. *Id.* at 197–98. As a result of plaintiff's mismanagement, the counterclaim alleges, there were insufficient funds with which to pay vendors for purchase orders and to reimburse contributors who were owed. *Id.* at 301. The counterclaim seeks a full accounting and reimbursement to the School District of any payments it has been required to make due to the insufficiency of funds in the account. Plaintiff has moved for partial summary judgment in her favor on defendant's counterclaim, on the grounds that (1) defendants do not possess standing to assert an equitable claim for an accounting; (2) defendants cannot meet the requirements to assert an action for an accounting; and (3) no fiduciary duty exists

between plaintiff and defendants. D.I. 100. Each argument will be addressed in turn.

Plaintiff argues that defendants have no standing to obtain an accounting of the cheerleader fund, because, as defendants themselves have admitted, the cheerleading association is "a private organization that is financially and legally separate and distinct from the high school and the Indian River School District." D.I. 101 at Exhibit ("Exh.") 3 (Letter of Edward Seibert to Cheerleader Danz Team dated March 6, 1995). Plaintiff argues that defendants were not required to make payments to the various vendors, and that their decision to do so was motivated by their own reputational interests. Defendants admit that the letter quoted above was sent, but dismisses it as legal posturing to commercial vendors in the attempt to compromise outstanding bills. Defendants argue that there is at least an issue of fact as to whether the cheerleading association is a separate legal entity and whether the school district was responsible for outstanding bills. D.I. 110 at 11–16. The Court agrees.

■■■ The standing doctrine is a barrier to reaching the merits of a claim, designed to determine whether a particular person is entitled to have a court decide the merits of his dispute. *See Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). A party has standing if it has suffered a direct injury which results in actual damages. *Id.* In this case, if defendants have suffered direct injury by plaintiff's cheerleading fund mismanagement which caused them actual damages, they will have standing to bring this action. Defendants allege that they have been injured by plaintiff's mismanagement of the cheerleading fund in that there were insufficient funds with which to pay debts incurred on behalf of the SCHS cheerleaders. This injury has caused them actual damages in the amount of

8. To the extent plaintiff intended to assert that the School District or the School Board are liable for Dr. Toomey's alleged assault because they knew or should have known Dr. Toomey engaged in prior acts of harassment, the Court would dismiss such claims as well. Those bodies could be held liable if "with deliberate indifference to the consequences, [they] established and maintained a policy, practice or custom which directly caused [Barkauskie] constitutional harm," *see Stoneking*, 882 F.2d at 725; however, even under a generous reading of her proposed second amended complaint, Barkauskie has not made such allegations.

approximately $3,500–$4,000, representing amounts already paid out to commercial vendors, and another amount of approximately $4,100 which is as yet unaccounted for. D.I. 19, ¶ 299.

■ Plaintiff argues defendants lack standing because they "created their own injury" by paying bills which they had no legal requirement to pay. D.I. 101 at 7–8. This Court's review of the record leads to the conclusion that summary judgment on the ground of standing will be denied. An issue of fact remains as to whether the account was an account separate and distinct from SCHS or whether it was entirely separate from the school, and as to whether defendants had a legal requirement to pay the outstanding bills.

Defendants provided an affidavit of Hudson which states that the cheerleading team at SCHS is a student organization and as a student organization, it is a part of, rather than separate from, SCHS. D.I. 111 at B–102–3. Hudson further states that funds raised or expended by the cheerleading accounts are, as a matter of school policy, maintained in one of the School District's internal accounts, but that plaintiff maintained the cheerleading account in her own name, in violation of that policy. *Id.* When plaintiff was asked to turn the funds over to the school's internal accounts, plaintiff failed to transfer the funds. *Id.* Further, the record contains correspondence from vendors who, although they dealt with plaintiff, directed correspondence to the School District. *See, e.g., id.* at B–184–87. These letters at least provide an inference that SCHS and the cheerleading association were not separate entities, and that the School District would be called upon to pay outstanding bills incurred for the cheerleading association. Further, the cheerleading squad for whom the items were purchased and fundraisers held is called the "Sussex Central High School Cheerleaders." Finally, there is evi-

dence in the record that plaintiff was required to seek authorization to make certain expenditures from the account. *Id.* at B–109–10. This requirement gives rise to the inference that the School District maintained at least some control over the account. Partial summary judgment on the ground of standing will be denied.

■ Plaintiff further argues that defendants cannot maintain their action for an accounting because they have not met the requirements for a claim for an accounting.[9] An accounting is an equitable remedy which arises from the defendant's possession of money which he is obliged to surrender, due to some particular relationship between himself and the plaintiff. *American Air Filter Co. v. McNichol*, 527 F.2d 1297, 1300 (3d Cir.1975). One type of relationship from which a duty to account may arise is the relationship of a fiduciary to his principal. *McMahon v. New Castle Assocs.*, 532 A.2d 601, 605 (Del.Ch.1987); *Boxer v. Husky Oil Co.*, 429 A.2d 995 (Del.Ch.1981). A fiduciary relationship is a relationship in which one person reposes special trust in another, or a relationship in which a special duty exists on the part of one person to protect the interests of another. *Cheese Shop Int'l, Inc. v. Steele*, 303 A.2d 689 (Del. Ch.), *rev'd on other grounds*, 311 A.2d 870 (1973) (*quoted in McMahon*, 532 A.2d at 604). The issue to be determined before reaching the claim for the accounting is whether plaintiff acted as a fiduciary to the School District. On this record and procedural posture, this question must be answered in the affirmative.

■ Delaware law recognizes the existence of a fiduciary relationship between principals and agents. *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del.1980) ("It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing."); *see also McMa-*

**9.** Plaintiff also argues that defendants have not met the four requirements for an accounting as set forth in *Bossaler v. Red Arrow Corp.*, 897 S.W.2d 629, 630 (Mo.App.1995). Whatever the persuasive weight of a Missouri appellate court decision might be in this case, this four-part test is not binding because it not the law in Dela-

ware. As defendants' counterclaim for an accounting is a state law claim, this Court is bound to apply Delaware law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Accordingly, this argument will not be addressed further.

*hon,* 532 A.2d at 604–05 ("Our law has acknowledged several such relationships [such as] ... principals and their agents.") (citations omitted). Within the agent's fiduciary duties running to the principal is a duty to "disclose information that is relevant to the affairs of the agency entrusted to him." *Science Accessories,* 425 A.2d at 962.

██ In this case, plaintiff, as cheerleading coach of the SCHS cheerleaders, acted as agent for SCHS. Vendors were contacted to provide team paraphernalia with SCHS logos and colors on behalf of the cheerleaders. Correspondence was directed to SCHS to the attention of plaintiff. D.I. 111 at B–184–86. Plaintiff received authorization for these purchases on behalf of the cheerleaders from the school administration. *Id.* at B–109–10. At the very least, there is an issue of fact as to whether plaintiff acted as SCHS's agent in conducting her responsibilities as cheerleading coach. Partial summary judgment on this ground will be denied.

### IV. Conclusion

Plaintiff's motion to amend the amended complaint will be granted. Defendants' motion for summary judgment on Counts I through XVI of the second amended complaint will be granted.[10] Defendants' motion for summary judgment as to plaintiff's section 1983 claims for defamation, intentional infliction of emotional distress and conspiracy will be granted. Plaintiff's claims under section 1983 for sexual assault, assault and battery will be dismissed. To the extent Counts XVI through LVIII raise claims under state law the Court declines to exercise supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), and those claims will be dismissed. Plaintiff's motion for partial summary judgment on defendants' counterclaim for an accounting will be denied. An appropriate order will be entered.

---

**10.** Plaintiff inadvertently labeled two counts of her second amended complaint as count XVI. The first Count XVI asserts a civil rights violation. Summary judgment is granted with respect to the first Count XVI. The second Count XVI asserts breach of contract. As will be seen below, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims. Accordingly, the Second Count XVI will be dismissed.